UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
J.L., Individually and on Behalf of and as Parent
of J.R., a Student with a Disability,

                              Plaintiff,               Docket No.
                                                      15-CV-1200 (CBA) (RER)

                - against -

NEW YORK CITY DEPARTMENT          ECF Case
OF EDUCATION,

                            Defendant.
------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


                                               THOMAS GRAY
                                               PARTNERSHIP FOR CHILDREN'S RIGHTS
                                               Attorney for Plaintiff
                                               271 Madison Avenue, 17th Floor
                                             New York, New York 10016
                                             (212) 683-7999 ext. 246
                                             tgray@pfcr.org


July 31, 2015

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT                                             1

STATEMENT OF FACTS                                               1

LEGAL FRAMEWORK AND STANDARD OF REVIEW          11

ARGUMENT                                                        15

POINT I: THE DOE FAILED TO MEET ITS BURDEN TO
PROVE THAT ITS EDUCATIONAL RECOMMENDATIONS
PROVIDED J.R. WITH A FAPE FOR THE 2012-2013
SCHOOL YEAR                                                     15

A.      The DOE Presented No Evidence to Justify Placing J.R. in a
        12:1+1 Classroom                                        15

B.      The SRO's Determination That the DOE's Recommended
        12:1+1 Program Provided J.R. with a FAPE Is Unsupported
        and Should Not Be Accorded Deference                    18

POINT II: THE DOE'S PLACEMENT SCHOOL, P.S. 8,
WAS UNABLE TO APPROPRIATELY IMPLEMENT THE IEP   24

A.      The SRO's Refusal to Assess Ms. L.'s Allegations
        Regarding P.S. 8 Is Contrary to the Law                 24

B.      The IHO Correctly Determined That P.S. 8 Could Not
        Appropriately Implement the IEP                         25

POINT III: J.R.'S PLACEMENT AT MARY MCDOWELL
WAS APPROPRIATE                                                 28

POINT IV: THE EQUITIES FAVOR AN AWARD
OF TUITION PAYMENT                                              31

POINT V: DIRECT PAYMENT OF TUITION
IS APPROPRIATE                                                  32

CONCLUSION                                                      33

## PRELIMINARY STATEMENT

Plaintiff J.L. (or "Ms. L.") commenced this action pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), on behalf of and as parent and guardian of J.R. to seek reversal of a final administrative decision rendered by the New York State Review Officer ("SRO"), which overturned the decision of an Impartial Hearing Officer ("IHO"), finding that Defendant New York City Department of Education ("DOE") offered J.R. a free appropriate public education ("FAPE") for the 2012–2013 school year and denying Ms. L.'s request for an order directing the DOE to pay J.R.'s tuition at the Mary McDowell Friends School ("Mary McDowell") for that school year.

## STATEMENT OF FACTS

J.R. was born in 2003 and is currently 12 years old (Exhibit ("Exh.") 1 at 1). During the 2012-2013 school year he was age nine and in the fourth grade (Exh. 1 at 1; Impartial Hearing Transcript ("Tr.") Tr. 94).

J.R. was first evaluated for special education services when he was in preschool after Ms. L. noticed that he had more difficulty learning than other children (Tr. 92-93). He has significant working memory difficulties and needs a great deal of repetition to learn new material and retain information (Exh. 1 at 1; Tr. 93).[1] J.R. needs significant learning supports due to expressive and receptive language processing impairments and auditory processing difficulties (Tr. 77, 79, 84). He becomes frustrated when he cannot keep up in class, and he requires a calm and intensively supportive environment to make progress (Exh. 1 at 1-2; Tr. 76-79).

---

[1] The term working memory generally refers to an individual's short term memory and attentional skills as applied to cognitive tasks. "*Working Memory* reflects a hypothesized memory-related ability that requires the holding of information 'online' so that manipulations or calculations can be performed (analogous to a mental scratch pad)." Jerome M. Sattler, Assessment of Children: Cognitive Applications, Fourth Edition 385, 388 (Jerome M. Sattler Pub., Inc. 2001).

J.R. attended public schools for kindergarten and first grade (Tr. 93-94). He had profound

difficulties learning during these school years, and by the end of the first grade he still had not

learned a single sight word (Tr. 93).[2] As a result, Ms. L. had a neurologist evaluate J.R; the

neurologist advised Ms. L. to find a school that was familiar with working with children with

J.R.'s specific learning disabilities (Tr. 93-94).

Ms. L. initially enrolled J.R. at Mary McDowell for his second grade year, the 2010-2011

school year (Tr. 94). While J.R. was able to make gradual progress at Mary McDowell during the

2010-2011 and 2011-2012 school years, he continued to struggle in his classes that contained

two teachers and 10 to 11 students (Exh. 1 at 1; Tr. 77, 83-84). J.R.'s difficulties with expressive

and receptive language made it a challenge for him to function in these settings (Tr. 77, 83-84).

He required lessons to be broken down into smaller components, and he needed more repetition

than could be provided (Tr. 77). When J.R. fell behind his peers in these classes he became

frustrated, which led to emotional outbursts (Exh. 1 at 2; Tr. 77-78, 87-88, 94-95, 103). During

the 2011-2012 school year J.R.'s therapist and educators determined that "to function more

effectively," J.R. needed a "smaller more intimate environment" than what he was currently

receiving in a classroom with two teachers and 11 students (Tr. 77-78, 87-88, 94-95).

### The May 29, 2012 Committee on Special Education Meeting and the DOE's IEP and Recommended Placement at P.S. 8

The DOE convened a Committee on Special Education ("CSE") meeting on May 29,

2012 to prepare J.R.'s Individualized Education Program ("IEP") for the 2012–2013 school year

(Exh. 1). Present at the meeting were: Shirley Piccola, a school psychologist assigned to CSE

---

[2] Sight words are commonly used words that children are encouraged to memorize as a whole by sight. Sight words relate to "instant word recognition," which is the ease and automaticity with which a skilled reader is able to read individual words. Judith R. Birsh, <u>Multisensory Teaching of Basic Language Skills</u> 569, 657 (Paul H. Brooks Pub., 2d ed. 2005).

Region 8 who also served as the district representative; Ann Parise, a special education teacher assigned to CSE Region 8; Anh Lui, a parent member of CSE Region 8; Ms. L.; and Michelle Carfagna, one of J.R.'s teachers at Mary McDowell during the 2011-2012 school year, who participated by telephone (Exh. 1 at 11).

     The only document before the individuals at the CSE meeting that was used to formulate an educational program for J.R. was a school report from Mary McDowell (Tr. 16). Based on this document and Ms. Carfagna's oral reports at the meeting, the DOE recommended placing J.R. in a 12:1+1 classroom – meaning a classroom with 12 students, one teacher, and one paraprofessional – for math, English Language Arts, social studies, and science (Exh. 1 at 6; Tr. 16). The IEP did not provide for J.R. to receive special education services in any other subject (*see* Exh. 1 at 6).

     The formulated IEP recommended 60 minutes per week of individual speech and language therapy, 30 minutes per week of individual occupational therapy, and 30 minutes per week of group counseling (Exh. 1 at 6). With regard to testing accommodations, the IEP required that J.R. be allowed extended time for "100% all testing" (Exh. 1 at 7). The IEP stated that "conditions" "for all testing" required that J.R. be tested in a location with minimal distractions (Exh. 1 at 7). On state and local assessments, he was to be given revised test formats with directions and questions read and re-read aloud, and to be allowed to use arithmetic tables as needed (Exh. 1 at 7).

     At the May 2012 CSE meeting, Ms. L. and Ms. Carfagna, J.R.'s teacher at Mary McDowell, stated that in order for J.R. to be able to manage frustration and learn he needed more one-on-one support and "a much smaller group throughout the school day" than a 12:1+1 classroom provided (Tr. 23; *see* Tr. 16, 25; Exh. 1 at 1). Despite Ms. L.'s and Ms. Carfagna's

3

objections to J.R. being placed in a 12:1+1 classroom, the DOE did not consider a smaller, more supportive setting (*see* Exh. 1 at 13). Rather, the only other settings that the DOE considered for J.R. were an Integrated Co-Teaching ("ICT") class, which may have up to 30 students in a classroom, and a special class with a 12:1 student-to-teacher ratio (Exh. 1 at 13).[3]

By an August 13, 2012 notice, the DOE recommended that J.R. be placed at P.S. 8 – The Shirlee Solomon School ("P.S. 8") for the 2012–2013 school year (Exh. 2). On August 22, 2012, Ms. L.'s counsel wrote to inform the DOE that Ms. L. had not yet been able to visit P.S. 8 because the school was closed, but that she would visit the school as soon as it reopened to determine if it was appropriate for J.R. The attorney also reiterated that Ms. L. believed that a 12:1+1 classroom could not meet J.R.'s needs and that absent an appropriate educational placement Ms. L. would reenroll J.R. at Mary McDowell for the 2012-2013 school year and seek tuition payment from the DOE (Exh. G). After the school year started, Ms. L's counsel wrote to the DOE again to report that Ms. L. had visited P.S. 8 and found that the class contained too many people and was not appropriate for J.R. (Exh. H).

**J.R.'s Enrollment at Mary McDowell**

Ms. L. signed a contract enrolling J.R. at Mary McDowell for the 2012–2013 school year on or about August 31, 2012 (Exh. F). The contract afforded Ms. L. flexibility to continue working with the DOE to identify an appropriate public school placement for J.R.; if Ms. L. decided to accept a public school placement for J.R. she could withdraw J.R. from Mary

---

[3] An ICT class includes students with and without disabilities and has two teachers, a general education teacher and a special education teacher. 8 N.Y.C.R.R. § 200.6(g). ICT classes in DOE schools may contain up to 30 students. *See* schools.nyc.gov/Academics/SpecialEducation/programs/environment/ict.htm (last visited July 31, 2015) ("The number of students with disabilities in an ICT class may not exceed 40% of the total class register or a maximum of 12").

McDowell by October 1, 2012 and only be financially responsible for a $500 deposit (Exh. F ¶¶ 2.a, 4). J.R.'s 2012–2013 school year tuition at Mary McDowell was $71,808.00 (Exh. F ¶ 2.a).

### J.R.'s Educational Program at Mary McDowell

For the 2012-2013 school year J.R . was assigned to a classroom at Mary McDowell called the Whittier Room; J.R. was placed in the Whittier Room due to his struggles functioning in classes with two teachers and 10 to 11 students during his first two years at the school (Exh. D; Exh. F; Exh. 1 at 1; Tr. 76-78, 83, 87-88, 94-95). The Whittier Room is a classroom with seven students and two teachers that offers a small, intimate environment (Exh. C; Tr. 57, 78). Mary McDowell established the Whittier Room for students whose "learning style and pace of learning required even more intense services and supports" (Exh. C; Tr. 75-76).

Like J.R., the Whittier Room's six other students had language-based learning disabilities and required a smaller student-to-teacher ratio than was generally provided in Mary McDowell's classrooms of up to 12 students (Exh. C; Tr. 75-76, 89). Academics were taught at a slow, consistent pace and teachers presented material "numerous times to allow for repetition" (Tr. 57, 76). The instruction was multi-sensory and hands-on, and classes were interactive to allow "the children to engage with the new material in numerous ways and over numerous times" (Tr. 57). The class broke into smaller groups for reading and math (Tr. 57-58, 63-64). The students were quiet, worked well together, and were not disruptive (Tr. 58, 76). J.R. received speech and language therapy and occupational therapy, and he met with a counselor (Tr. 61-62).

J.R.'s reading comprehension and speech and language skills improved during the 2012-2013 school year (Tr. 65-67, 96). He also gained confidence in his abilities and learned to better control his frustration (Tr. 58, 96). He became more independent in completing his homework and more engaged with other children (Tr. 96).

5

**The Impartial Hearing**

On November 19, 2012, Ms. L., through counsel, filed a due process complaint alleging

that the DOE's recommended 12:1+1 program and the proposed placement school, P.S. 8, were

not appropriate for J.R. (Exh. 4 (the due process complaint is attached to the DOE's Verified

Petition and marked as "DOE Ex. 4")). Specifically, the complaint stated that the DOE's

recommended 12:1+1 program provided a setting that "was too large for [J.R.'s] educational

needs" (Exh. 4 at 2). With regard to P.S. 8, the complaint alleged that Ms. L. had visited the

school and observed that, among other things, the school's 12:1+1 classroom contained too many

people to be appropriate for J.R. (Exh. 4 at 2).

The complaint requested that an IHO find: 1) that the DOE failed to offer J.R. a FAPE for

the 2012–2013 school year; 2) that Mary McDowell's Whittier Room was an appropriate

placement for J.R.; and 3) that equitable considerations favored Ms. L.'s claim for tuition (Exh. 4

at 3). The complaint requested an order directing the DOE to pay J.R.'s 2012–2013 school year

tuition, totaling $71,808.00, directly to Mary McDowell (Exh. 4 at 3).

The case was assigned to IHO Esther Mora, who presided over a hearing conducted on

December 20, 2012 and January 24 and February 26, 2013 (Tr. 1-121).

While the IDEA, at 20 U.S.C. § 1415(f)(2)(A), requires that parties disclose evidence five

business days prior to the start of an impartial hearing, the DOE did not provide its evidence to

Ms. L.'s attorney until the start of the January 24, 2013 hearing date (*see* Tr. 9-11, 37, 109). The

DOE offered three pieces of documentary evidence: 1) the IEP formulated at the May 2012 CSE

meeting (Exh. 1); 2) a Final Notice of Recommendation, dated August 13, 2012, placing J.R. at

P.S. 8 (Exh. 2); and 3) a certified mail receipt addressed to Ms. L. stamped August 14, 2012, as

well as a return receipt dated August 15 (Exh. 3). The DOE did not present any documentary

evidence, including the Mary McDowell school report that was before the individuals at the May 2012 CSE meeting, to support the recommendations contained in the IEP (Tr. 16; *see* Exhibits ("Exhs.") 1-3).

The DOE presented testimony from two witnesses at the impartial hearing: Ms. Piccola, the DOE district representative at the May 2012 CSE meeting (Tr. 12-25); and Jennie Datre, the special education teacher in P.S. 8's fourth grade 12:1+1 classroom (Tr. 38-53). Ms. Piccola testified that the DOE's recommendations for J.R.'s 2012-2013 school year were based only on a Mary McDowell school report and information that Mary McDowell teacher Ms. Carfagna presented at the CSE meeting (Tr. 16). In her testimony, Ms. Piccola recounted the contents of the formulated IEP, but offered no justification for the DOE's recommendation that J.R. be placed in 12:1+1 classroom (*see* Tr. 12-25). Additionally, Ms. Piccola acknowledged that at the CSE meeting both Ms. L. and Ms. Carfagna stated that J.R. "needed a much smaller group throughout the course of the school day" than could be provided in a 12:1+1 classroom (Tr. 23).

Ms. Datre testified that while she believed that most of the IEP's recommendations could be implemented in her classroom she did not think that P.S. 8 had the personnel to adhere to the IEP's testing recommendations (Tr. 43-47, 49-50). Ms. Datre stated:

> The only concern I had was for his [testing] accommodations, for all testing it says that he has to have location, a separate location with minimal distraction, and that was my only concern because if he had to be removed from the classroom to have a separate location with minimal distractions, I don't know if we have the personnel to have someone sit with him for every test

(Tr. 46). And, later, when asked to clarify if P.S. 8 could comply with the IEP's testing recommendations, Ms. Datre stated, "Not for all testing, no" (Tr. 50). She explained that if J.R. attended P.S. 8 his IEP would probably need to be changed to require a location with minimal distractions only on standardized testing (Tr. 50).

Ms. Datre also testified that three students in her classroom had behavioral issues (Tr. 50-51). One of the students in her classroom "is an ongoing -- he's an issue every day" (Tr. 50). If J.R. needed to be in an environment with only minimal distractions, Ms. Datre stated that he would have to be removed from her classroom to another location (Tr. 47).

In addition to presenting nine documents and testifying on her own behalf (*see* Exhs. A-I; Tr. 91-108), Ms. L. presented testimony from Elizabeth Ballantyne, one of J.R.'s teachers at Mary McDowell during the 2012–2013 school year (Tr. 55-68), and Beth Schneider, the Associate Head of School at Mary McDowell (Tr. 68-91).

### The IHO's March 19, 2013 Findings of Fact and Decision

On March 19, 2013, IHO Mora issued a Findings of Fact and Decision ("FFD"), determining that the DOE failed to offer J.R. a FAPE for the 2012–2013 school year (FFD 7-8). Noting that the evidence demonstrated that J.R. had recently struggled in classrooms with 10 to 11 students at Mary McDowell, the IHO determined that the DOE's recommended 12:1+1 program would not have provided him with sufficient support (FFD 7).

With regard to the DOE's proposed placement school, P.S. 8, the IHO determined that the recommended classroom was not appropriate for J.R. because at least three other students in the classroom had behavior problems (FFD 7). As J.R. required "a quiet, calm and focused environment" the IHO found that the "chaotic environment" at P.S. 8 "would impede his learning because of his language and auditory deficits" (FFD 7). Furthermore, the IHO determined that P.S. 8 "did not have sufficient staff to meet the IEP mandate" that J.R. be tested in a location with minimal distractions (FFD 7-8).

The IHO further determined that Mary McDowell provided J.R. with appropriate services for the 2012-2013 school year and that equitable considerations supported Ms. L.'s claim for

tuition funding as she had cooperated with the DOE (FFD 8). Therefore, the IHO ordered the DOE to fund J.R.'s placement at Mary McDowell (FFD 8).

### The Administrative Appeal

By an April 23, 2013 Verified Petition, the DOE appealed the IHO's decision to the SRO. The DOE first asserted that it offered J.R. a FAPE for the 2012-2013 school year (Verified Petition (or "Pet.") ¶¶ 26-38). The DOE argued that its 12:1+1 program recommendation "conforms with requirements set by state regulations" for "students whose management needs interfere with the instructional process" (Pet. ¶ 27). The DOE also argued that its 12:1+1 program recommendation was appropriate because, contrary to the IHO's determination, the record indicated that J.R. had made some progress in the Mary McDowell classrooms that contained 10 to 11 students (Pet. ¶ 28).

With regard to the DOE's proposed public school placement, the DOE first argued that the IHO's decision that P.S. 8 was inappropriate for J.R. was irrelevant and speculative (Pet. ¶¶ 29-30). Additionally, the DOE argued that Ms. L. did not sufficiently allege in the due process complaint that P.S. 8 would not appropriately group J.R. and could not fulfill the IEP's testing mandates (Pet. ¶¶ 31, 34). The DOE also argued that it was "speculative" for the IHO to determine that three of the students in Ms. Datre's class had behavior problems, and asserted that the school could have implemented the IEP's testing accommodations (Pet. ¶ 33-35).

The DOE also asserted that Mary McDowell was not an appropriate placement for J.R. for the 2012-2013 school year, that equitable considerations did not support Ms. L.'s claim for tuition funding, and that Ms. L. had not sufficiently demonstrated that her financial situation warranted direct tuition funding to Mary McDowell (Pet. ¶¶ 39-49).

Ms. L. filed a Verified Answer and Cross-Appeal on May 31, 2013, responding to the arguments set forth in the DOE's Verified Petition and cross-appealing the IHO's decision to accept the DOE's documents into evidence despite the DOE's failure to disclose the evidence to Ms. L. five business days prior to the commencement of the hearing (Ver. Asr. ¶¶ 47-51).

### The SRO's November 25, 2014 Decision

Pursuant to the federal regulations implementing the IDEA, the SRO was required to issue a decision in the DOE's appeal "not later than 30 days" after the receipt of the request for review. 34 C.F.R. § 300.515(b)(1). In flagrant violation of this mandate, the SRO did not issue a decision until November 25, 2014, nearly 18 months after the appeal was fully submitted and over 20 months after the IHO granted Ms. L.'s claim for tuition payment.

In the decision, SRO Carol H. Hauge overturned the IHO's decision, sustained the DOE's appeal, and dismissed Ms. L.'s cross-appeal (SRO Appeal 13-065 ("SRO Dec.") at 10). The SRO first determined that it was within the IHO's discretion to admit the DOE's evidence despite the DOE's failure to disclose the evidence five business days prior to the start of the hearing (SRO Dec. 5).

Next, the SRO noted that the record did not contain any of the evidence that the DOE relied on in making educational recommendations for J.R. for the 2012-2013 school year (SRO Dec. 6). Nevertheless, the SRO recounted the contents of the formulated IEP, determined that the IEP appeared to correctly reflect J.R.'s "present levels of performance," and found that "the May 2012 CSE developed annual goals and recommended management supports, testing accommodations, and related services to address [J.R's] needs, which in conjunction with a 12:1+1 special class placement, was reasonably calculated to enable the student to receive educational benefits and provide him with a FAPE" (SRO Dec. 6-8).

10

In a footnote, the SRO appeared to assert that J.R.'s great difficulty functioning in classrooms with two teachers and 10 to 11 students at Mary McDowell was unknown to the individuals at the May 2012 CSE meeting because this information was conveyed at the impartial hearing through Mary McDowell educator Ms. Schneider, who did not attend the CSE meeting (SRO Dec. 7 n.2).

The SRO did not address any issues regarding P.S. 8's ability to implement the IEP's recommendations and provide J.R. with an appropriate education (*see* SRO Dec. 8-10). Rather, the SRO stated that Ms. L.'s claims regarding P.S. 8 were "speculative" because "the parent rejected the assigned public school site that the student would have attended and instead chose to enroll the student in a nonpublic school of her choosing prior to the time the district became obligated to implement the May 2012 IEP" (SRO Dec. 9).

Having determined that the DOE offered J.R. a FAPE for the 2012-2013 school year the SRO deemed it unnecessary to address the appropriateness of J.R.'s placement at Mary McDowell and the equities of the case (SRO Dec. 10). The SRO did not address whether the DOE should be ordered to pay J.R.'s tuition directly to Mary McDowell (*see* SRO Dec. 10).

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### The Purpose and Scope of the IDEA

The purpose of the IDEA is to ensure that all children with disabilities are provided with a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA seeks to ensure "that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B).

To satisfy the IDEA's requirements, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982), "tailored to meet the unique needs of a particular child," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998), "and provided in conformity with an individualized education program, or IEP," *Reyes ex rel. R.P. v. New York City Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014) (citing 20 U.S.C. § 1401(9)(D)). "The IEP, which the school district is required to prepare annually, must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives." *Reyes*, 760 F.3d at 214 (citing 20 U.S.C. § 1414(d)).

The district is also required to provide a placement school capable of implementing the IEP. "School districts do not have 'carte blanche' to assign a child to a school 'that cannot satisfy the IEP's requirements.'" *M.O. v. New York City Dep't of Educ.*, __F.3d__, 2015 WL 4256024, at *7 (2d Cir. July 15, 2015) (quoting *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009). "To conclude otherwise would require parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP, which is 'antithetical to the IDEA'[s] reimbursement process.'" *Id.* (quoting *V.S. ex rel. D.S. v. New York City Dep't of Educ.*, 25 F.Supp.3d 295, 300 (E.D.N.Y. 2014)).

### Tuition Claims Under the IDEA

Under the standard set forth by the United States Supreme Court in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7 (1993), a school district may be required to pay for

12

educational services obtained by a parent for her child if: 1) the services offered by the district were inadequate or inappropriate ("Prong I"); 2) the services obtained by the parent were appropriate ("Prong II"); and 3) equitable considerations support the parent's claim ("Prong III"). *Carter*, 510 U.S. at 12, 16; *Burlington*, 471 U.S. at 369, 374. When the three *Burlington* prongs are satisfied, parents who have unilaterally placed their child in a private school may obtain payment for the tuition from the district. *Id*.

Furthermore, payment of the tuition directly to the private school is appropriate where a school is willing to admit the child of a low-income parent while the parent pursues her due process remedies under the IDEA. *See E.M. ex rel. N.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 453-54 (2d Cir. 2014) ("[i]ndeed, where the equities call for it, direct payment fits comfortably within the *Burlington-Carter* framework: like reimbursement, direct payment to the private school that provided the required educational program 'merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP'") (quoting *Burlington*, 471 U.S. at 370-71).

Parents seeking payment for the cost of a unilateral private school placement must first litigate their claim in an impartial due process hearing. *See* 20 U.S.C. § 1415(f). New York State law places the burden of proof – including both the burdens of production and persuasion – at impartial hearings on school districts with respect to all issues other than the appropriateness of a unilateral private school placement selected by the parents. N.Y. Educ. L. § 4404(1)(c).

In two-tiered states such as New York, in which hearings are conducted at the school district level, the hearing decisions are subject to state-level appeals; in New York such appeals are conducted by the SRO. 20 U.S.C. § 1415(g); 8 N.Y.C.R.R. § 200.5(k). Once these

13

administrative remedies have been exhausted, either the parent or the school district may seek independent judicial review in the state or federal courts. 20 U.S.C. § 1415(i)(2)(A).

### IDEA District Court Actions

While motions for summary judgment customarily resolve IDEA actions in federal court, "such a motion in the IDEA context is in substance an appeal from an administrative determination, not a summary judgment." *P.L. v. New York Dep't of Educ.*, 56 F.Supp.3d 147, 158 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). "Summary judgment in the IDEA context [...] is only a pragmatic procedural mechanism for reviewing administrative decisions." *M.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013) (internal quotation marks and citation omitted).

"[T]he district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" giving "due weight" to the administrative proceedings. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal citations omitted). The "SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (quoting *Gagliardo*, 489 F.3d at 114).

The court does not accord "due weight" when there are no administrative findings on an issue. *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F.Supp.2d 420, 432 (S.D.N.Y. 2008). Nor does a court accord "due weight" to administrative proceedings when determining questions of law. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005); *see also E.M. ex rel. N.M.*, 758 F.3d at 456-57 ("we need not defer to the findings of state administrative officers on questions, such as contract interpretation or the requirements of standing, that fall outside of their field of expertise"); *M.H.*, 685 F.3d at 244

(observing that the weight due to administrative determinations "will vary based on the type of determination at issue").

Generally, a reviewing court's "analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244. "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id*.

Additionally, "where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court … to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *Id*. at 246. A court should defer to an IHO's well-reasoned analysis when the SRO has not reached the issue. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 82 (2d Cir. 2014).

## ARGUMENT

### POINT I: THE DOE FAILED TO MEET ITS BURDEN TO PROVE THAT ITS EDUCATIONAL RECOMMENDATIONS PROVIDED J.R. WITH A FAPE FOR THE 2012-2013 SCHOOL YEAR

#### A.  The DOE Presented No Evidence to Justify Placing J.R. in a 12:1+1 Classroom

At the impartial hearing, the DOE bore the burden at *Burlington* Prong I of proving that it provided J.R. with a FAPE. The DOE failed to meet this burden as it presented no evidence to support its recommendation for J.R. to be placed 12:1+1 classroom.

15

In cases such as this one, where a parent is seeking tuition funding from a school district due to the district's failure to provide her child with a FAPE, New York State law places the burden of proof – both the burdens of production and persuasion – on the district:

> The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.

N.Y. Educ. Law § 4404(1)(c). *See C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014) ("Under New York law, at the due process hearing, the Department bears the burden of establishing the validity of the IEP").

Ms. L.'s central allegation at the hearing was that the DOE's recommended 12:1+1 program was not appropriate for J.R. (Exh. 4 at 1-2). Yet, at the impartial hearing the DOE failed to provide any of the evidence that it relied upon to craft its educational recommendations for J.R. (*see* Exhs. 1-3). The DOE district representative at the CSE meeting, Ms. Piccola, testified that the DOE's recommendations were based on two sources of information: a school report from Mary McDowell and information from J.R.'s teacher at Mary McDowell Ms. Carfagna (Tr. 16). However, the DOE did not present the Mary McDowell school report at the hearing, and it is not part of the administrative record (*see* Exhs. 1-4, A-I). Nor did the DOE call Ms. Carfagna to testify about the information she provided at the CSE meeting (*see* Tr. 1-121).

Furthermore, Ms. Piccola did not explain what information contained in the school reports or gleaned from Ms. Carfagna's statements at the CSE meeting supported placing J.R. in a 12:1+1 classroom (*see* Tr. 12-25). The recounted details of Ms. Carfagna's statements at the CSE meeting only undermine the basis of the DOE's recommendation to place J.R. in a 12:1+1

classroom. Ms. Piccola testified that Ms. Carfagna stated at the CSE meeting that J.R. "needed a
much smaller group throughout the course of the school day" than a 12:1+1 classroom could
provide (Tr. 23). Indeed, the bulk of Ms. Piccola's testimony did not concern the DOE's
recommended classroom size and staffing ratio and instead focused on the goals contained in the
IEP (*see* Tr. 17-21). However, there is no dispute regarding the appropriateness of IEP's goals.
The dispute raised at the CSE meeting (Tr. 23), as well as before the IHO (Exh. 4 at 1-2), was
whether a 12:1+1 program would allow J.R. to make the progress necessary to achieve the IEP's
academic, social, and other goals.

As the DOE presented no evidence that supported its recommended 12:1+1 classroom,
the DOE failed to meet its burden of production. The three documents that the DOE presented at
hearing do not support its 12:1+1 program recommendation. The notice and related mailing
receipts placing J.R. at P.S. 8 are irrelevant to the basis of DOE's 12:1+1 program
recommendation (*see* Exhs. 2-3). And the IEP's recommendation that J.R. be placed in a 12:1+1
classroom is not self-substantiating. The DOE was required to present evidence from which a
fact-finder could conclude that its 12:1+1 program recommendation provided J.R. with
appropriate educational services. *See Brock ex rel. S.B. v. New York City Dep't of Educ.*, No. 13-
CV-8673, 2015 WL 1516602, at *6-7 (S.D.N.Y. Mar. 31, 2015) (finding that where "[n]one of
the documents relied upon in developing the [IEP] was provided at the hearing, and therefore
these documents were unavailable for review" the Court was "unable to examine the basis for the
opinions presented before the IHO, let alone to determine whether a preponderance of the
evidence supports the provision of a FAPE"). Furthermore, having failed to produce any
documentary or testimonial evidence that supported its 12:1+1 classroom recommendation there
is nothing in the record for the DOE to have relied on to meet its burden of presuation under

17

New York State law. N.Y. Educ. L. § 4404(1)(c). *See B.R. v. New York City Dep't of Educ.*, 910 F.Supp.2d 670, 678 (S.D.N.Y. 2012) ("Bare, unsubstantiated, conclusory assertions are far from sufficient for the Department to carry its burden . . . ."). Therefore, the IHO was correct to determine that J.R. "would not have received sufficient support services in the recommended class" (FFD 7).

### B. The SRO's Determination That the DOE's Recommended 12:1+1 Program Provided J.R. with a FAPE Is Unsupported and Should Not Be Accorded Deference

The SRO's determination that the DOE's recommendation to place J.R. in a 12:1+1 classroom provided him with a FAPE is unsupported, unreasoned, and entitled to no deference from this Court. *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (an "SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference") (citation omitted).

Initially, it should be noted that in determining that the DOE's 12:1+1 program recommendation provided J.R. with a FAPE the SRO acknowledged that the "hearing record does not contain any Mary McDowell school reports for the student, nor did the student's classroom teacher who participated in the May 2012 CSE meeting testify at the impartial hearing" (SRO Dec. 6). The SRO cites no testimonial evidence indicating that a 12:1+1 program was appropriate for J.R. (*see* SRO Dec. 6-8). Instead of recognizing that the DOE had failed to meet its burden of proof at *Burlington* Prong I, the SRO points to issues and evidence that are irrelevant to whether J.R.'s needs could be met in a 12:1+1 classroom.

The SRO found that because the Ms. L.'s due process complaint did not challenge the adequacy of the evaluative information the DOE "relied upon to develop the May 2012 IEP" it must be presumed that the IEP contains "an accurate reflection of the student's skills and needs" (SRO Dec. 6). However, as demonstrated below the IEP does not contain an entirely accurate

18

reflection of J.R.'s academic functioning. Moreover, while there was no dispute at the impartial hearing that the IEP recounted some of J.R.'s management needs generally, such as his need for "extensive repetition and review" and his need to be in a "very small group," the IEP does not resolve the disagreement raised at the CSE meeting about whether J.R. would have received enough "repetition and review" and an appropriate amount of individual and small group instruction in a 12:1+1 classroom (Exh. 1 at 1; Exh. 4; Tr. 23).

Furthermore, while the SRO asserts that other information contained in the IEP indicates a 12:1+1 classroom was appropriate for J.R., the conclusions the SRO draws from the contents of the IEP are illogical and unsupported (SRO Dec. 6). Initially, the SRO's assertion that the IEP accurately reflected J.R.'s skills is incorrect as the IEP contains internally inconsistent information of J.R.'s functioning in math (*compare* Exh. 1 at 9 (indicating that J.R. was at a "3rd Grade" "functional/instructional" level in math) *with* Exh. 1 at 1 (indicating that J.R. was at the "mid 1st grade" level in "Calculation" and "Applied Problems") and Tr. 69, 74 (testimony noting this error)). The SRO's assertion is also of little relevance as the SRO does not explain how J.R.'s particular levels of academic functioning show that he would be able to make progress in a 12:1+1 classroom.

The SRO also points to the IEP's description of J.R.'s functioning at Mary McDowell during the 2011-2012 school year. The SRO writes that the IEP "indicated the student's performance during reading and math was inconsistent, his attention to tasks affected his academic performance, and that he required extensive repetition and review of previously learned skills, noting that his difficulty with working memory and language affected his ability to master academic concepts" (SRO Dec. 6, citing Exh. 1 at 1). However, the SRO does not explain how J.R.'s inconsistent academic performance, need for extensive repetition and review, and his

19

impairments in working memory and language skills supported the DOE's recommendation to take J.R. out of a classroom with two teachers and 11 students and place him in a classroom with even less support (*see* SRO Dec. 6). *Cf. B.R. v. New York City Dep't of Educ.*, 910 F.Supp.2d 670, 676 (S.D.N.Y. 2012) (rejecting an SRO decision that was based on "generalities and unsupported assertions").

In a footnote, the SRO acknowledges that J.R. was having profound difficulties in his class of 11 students and two teachers during the 2011-2012 school year but attempts to downplay these difficulties by inferring that the individuals at the May 2012 CSE meeting may not have been aware of J.R.'s problems in classes at Mary McDowell that had 11 students and two teachers (*see* SRO Dec. 7 n.2 (noting that the IHO's finding that "the hearing record established that the student had 'recently attended classes with ten and eleven students and had great difficulty'" was based on the testimony of Ms. Schneider "who did not participate in the May 2012 CSE meeting")). This inference is unfounded.

First, there is no question that the individuals at the May 2012 CSE meeting were aware that J.R. was currently in a class with 11 students and two teachers. Both Ms. L. and Ms. Carfagna attended the meeting and were aware of J.R.'s classroom ratio (Exh. 1 at 11). All of the individuals at the meeting had before them a Mary McDowell school report (Tr. 16). Mary McDowell's standard elementary classes contain 10 to 12 students (Exh. A at 1; Tr. 75). Ms. Piccola repeatedly stated that both Ms. L. and Ms. Carfagna were concerned that J.R. needed to be placed in a program with a "very small group" (Tr. 16, 23, 25). And this concern is noted on the IEP (Exh. 1 at 1). The SRO's assumption that the basis of Ms. L.'s and Ms. Carfagna's belief that J.R. should be in a "very small group" was not elicited at the CSE meeting is baseless. Indeed, the record is clear that at around the time of the May 2012 CSE meeting, J.R. was in

danger of being "counseled out" of Mary McDowell due to his problems in a classroom with 11 students and two teachers (Exh. C; Tr. 77-78, 83, 87-88, 94-95). Even the DOE's Verified Petition acknowledges that all the individuals at the May 2012 CSE meeting were aware of the make-up of J.R.'s classes at Mary McDowell (*see* Pet. ¶ 28 (asserting that the DOE's 12:1+1 program recommendation was appropriate for J.R. because "J.R. showed that he was capable of learning in a class at [Mary McDowell] during the 2011-2012 [school year] where there were ten or eleven students ...")).

Second, the SRO's reasoning that the DOE's failure to acquire basic information about J.R.'s educational history supports its educational recommendations for him is illogical. Assuming for the sake of argument that the DOE was unaware of the student-to-teacher ratio in J.R.'s classroom during the 2011-2012 school year, the DOE's failure to understand J.R.'s problems in his then-current classroom of 11 students and two teachers does not support placing him in a less supportive 12:1+1 classroom as the SRO infers. Rather, it only supports a finding that the DOE had too little an awareness of J.R.'s functional abilities to craft educational recommendations that met his "unique needs." 20 U.S.C. § 1400(d)(1)(A).

In reasoning that a 12:1+1 classroom was appropriate for J.R. the SRO also notes that the DOE "considered and rejected an integrated co-teaching 'class' due to the student's academic deficits, and also rejected a 12:1 special class in a community school due to the student's 'need for consistent redirection/prompts/checks ins'" (SRO Dec. 7). However, that the DOE considered and declined to recommend programs that were even less supportive of J.R. than a 12:1+1 classroom is irrelevant to Ms. L.'s allegation that J.R. needed more support than a 12:1+1 classroom could provide (Exh. 4 at 1-2).

The SRO writes that "[s]tate regulations provide that a 12:1+1 special class placement is designed to address students 'whose management needs interfere with the instructional process to the extent that an additional adult is needed within the classroom to assist in the instruction of such student'" (SRO Dec. 7, quoting 8 N.Y.C.R.R. § 200.6(h)(4)(i)). However, the SRO does not explain how J.R. fit into this category (*see* SRO Dec. 7). The state regulations also provide that an 8:1+1 special class placement is designed for students "whose management needs are determined to be intensive." 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(b). The state regulations provide that a 6:1+1 special class placement is designed for students "whose management needs are determined to be highly intensive." 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a). Yet, the SRO does not explain why J.R. should not have been placed in one of these settings for students with "intensive" or "highly intensive" management needs (*see* SRO Dec. 7).

Similarly, the SRO noted that Ms. Piccola testified about how lessons were "typically" taught in a 12:1+1 classroom (SRO Dec. 7). However, the SRO does not explain how Ms. Piccola's testimony that "in 12:1+1 classes the special education teacher and/or teaching assistant deliver the lesson and then work with students in both 'small' groups and one on one" supports finding that J.R. would receive enough small group and one-to-one support in a 12:1+1 classroom to meet his unique needs (SRO Dec. 7, citing Tr. 19-21).

In short, in determining that the DOE's 12:1+1 program recommendation provided a FAPE to J.R., the SRO simply recounted some of contents of the administrative record but failed to actually assess how the record supports its determination. *Cf. C.L. ex rel. H.L. v. New York City Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) ("The SRO's Decision on this issue merely states the issue, states the conclusion, summarizes the CSE meetings and the IEP, states the conclusion again, summarizes the evidence presented at the

hearing, and then states the conclusion a third and final time. At no point does the SRO actually

analyze the evidence or explain the reasons for its determination") (citation omitted)).

Indeed, a review of the facts in this case reveals that not only did the DOE fail to present

any evidence to support placing J.R. in a 12:1+1 classroom, but every witness who actually knew

J.R. and worked with him stated that his particular needs could not be met in a 12:1+1

classroom. Ms. L. and J.R.'s teacher, Ms. Carfagna, informed the individuals at the May 2012

CSE meeting that J.R. needed "a much smaller group throughout the school day" than a 12:1+1

classroom could provide (Tr. 23). At the hearing, Mary McDowell educator Ms. Schneider

testified that she discussed J.R.'s performance with his teachers, his mother, and his therapist,

and that she had taught him for a time when his regular reading teacher was on maternity leave

(Tr. 83-85). Ms. Schneider testified that J.R. would become frustrated in a 12:1+1 classroom and

that his receptive and expressive language processing and his auditory processing would be

overwhelmed in such a setting; J.R.'s attention would be impacted and he would not receive the

consistent level of support he needed (Tr. 79). That the SRO ignored the evidence of Ms.

Carfagna's and Ms. L.'s objection to the 12:1+1 program and only referenced Ms. Schneider's

testimony in a footnote demonstrates the cursory manner in which the SRO assessed the record

(SRO Dec. 5-10). *Cf. F.O. v. New York City Dep't of Educ.*, 976 F.Supp.2d 499, 513 (S.D.N.Y.

2013) (finding an SRO decision to be inadequately reasoned where there "the SRO's opinion

failed to consider thoroughly or carefully contrary testimony from witnesses present at the IHO

hearing, even when that testimony was relied upon by the IHO").

Moreover, in this case, where the DOE presented no evidence that supports its decision to

place J.R. in a 12:1+1 classroom and where all the evidence from individuals who actually knew

him indicates that such a placement was inappropriate, the DOE has not met its burden to prove

that it offered J.R. a FAPE. The Second Circuit has recently found that the DOE did not offer a student a FAPE where "all witnesses familiar with" the student testified that he needed a more individualized program, and where the only rebuttal the DOE offered was from a DOE special education teacher who stated that the student "would fit in her classroom." *C.F. ex rel. R.F.*, 746 F.3d at 81. Similarly, a sister court recently found that "the SRO's reliance on *one* district special education teacher's contention that [the child] did not require "any additional teaching support" over the testimony of *two* teachers who knew [the child] and taught [the child] in class—*without noting the IHO's finding of credibility for or against any witness*—flies in the face of reason." *S.B. v. New York City Dep't of Educ.*, No. 14-CV-0349, 2015 WL 3919116, at *10 (S.D.N.Y. June 25, 2015) (emphasis in original). Indeed, the facts of this case are even stronger than those presented in *S.B.*, as in this case not even the DOE district representative Ms. Piccola stated that J.R.'s unique needs could be met in a 12:1+1 classroom (*see* Tr. 12-25).

### POINT II: THE DOE'S PLACEMENT SCHOOL, P.S. 8, WAS UNABLE TO APPROPRIATELY IMPLEMENT THE IEP

#### A. The SRO's Refusal to Assess Ms. L.'s Allegations Regarding P.S. 8 Is Contrary to the Law

The SRO reversed the IHO's finding regarding the inappropriateness of the DOE's recommended placement school, P.S. 8, because the SRO erroneously believed that under the Second Circuit's holding in *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012), "challenges to an assigned public school site are [...] speculative when the student never attended the recommended placement" (SRO Dec. 8). The SRO wrote that because Ms. L. "rejected the assigned public school site that the student would have attended and instead chose to enroll the student in a nonpublic school … the arguments asserted by the parent with respect

to the assigned public school site are speculative" (SRO Dec. 9). The Second Circuit has rejected the SRO's interpretation of *R.E.*

In *M.O. v. New York City Department of Education*, __F.3d__, 2015 WL 4256024 (2d Cir. July 15, 2015), the Circuit rejected the SRO's position that "under our decision in *R.E.*, a child must physically attend a proposed placement school before challenging that school's ability to implement their IEP." *M.O.*, 2015 WL 4256024, at *6. Instead, the Circuit held that only parents' assertions regarding districts' placement schools that were based on "mere speculation" were impermissible under *R.E. Id.* The Circuit explained that "[w]hile it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates […] it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *Id.*, at *7. Thus, in this case, the SRO's entire analysis of Ms. L.'s allegations regarding P.S. 8 was legally erroneous (*see* SRO Dec. 8-10).

## B.  The IHO Correctly Determined That P.S. 8 Could Not Appropriately Implement the IEP

The IHO correctly concluded that P.S. 8 "did not have sufficient staff" to provide "a separate location for all tests" and was not able to provide the "quiet, calm and focused environment" J.R. required to learn (FFD 7-8).

J.R.'s 2012-2013 school year IEP required that the "conditions" of "all testing" be in a "[l]ocation with minimal distractions" (Exh. 1 at 7). Initially, it should be noted that while the language of the IEP is somewhat confusing as to whether J.R. required a location with minimal distractions for all testing or just on state and local assessments, as detailed below there was no dispute at the hearing that this provision of the IEP applied to all testing (Tr. 43-47, 49-50). The IHO found that the IEP mandated "testing in a separate location for all testing" (FFD 7-8). The

25

SRO made no contrary factual finding (*see* SRO Dec. 7 (noting that "[t]esting accommodations provide in the IEP included extended time on all tests, administration in a location with minimal distractions, directions and questions read and reread aloud, and arithmetic tables as needed")).

Ms. L. visited P.S. 8's 12:1+1 classroom after 2012-2013 school year opened and then informed the DOE that she had observed that the class was too crowded for J.R. (Exhs. G, H). Indeed, the evidence presented at the hearing confirms Ms. L.'s observation that P.S. 8 was too crowded for J.R. and demonstrates that P.S. 8 did not have either the space or the staff to implement the IEP's testing recommendations. Ms. Datre explained that after reviewing the IEP, "[t]he only concern I had was for his [testing] accommodations, for all testing it says that he has to have location, a separate location with minimal distraction, and that was my only concern because if he had to be removed from the classroom to have a separate location with minimal distractions, I don't know if we have the personnel to have someone sit with him for every test" (Tr. 46). Later, Ms. Datre reiterated that P.S. 8 could not comply with the IEP's recommendation that J.R. be tested in a location with minimal distractions (Tr. 49-50). She explained that "[f]or the standardized testing we would be able to do it, but every test, like every assessment I give within my classroom, I don't know – no" (Tr. 50). Instead, Ms. Datre suggested that if J.R. attended P.S. 8 his IEP should be altered: "What I would say is maybe change [the IEP] to just standardized testing, otherwise if there is someone not available, then yeah, he would have to be tested in my room" (Tr. 50). Thus, the evidence is clear that the DOE's placement school could not implement the IEP's requirement that J.R. take all tests in a location with minimal distractions (Exh. 1 at 7). *Cf. B.R.*, 910 F.Supp.2d at 676 (concluding that where the DOE "failed to prove that the proposed placement would provide [the child] with her IEP-recommended one-

on-one occupational therapy [...] the proposed placement did not provide [the child] with the FAPE the IDEA mandates").

Ms. Datre's testimony also fully supports the IHO's determination that P.S. 8 would not have provided the "quiet, calm, and focused environment" that J.R. required (FFD 7). The IEP indicates that J.R. cannot function in a tumultuous setting. Beyond the testing accommodations, the IEP notes that J.R.'s "attention to tasks [e]ffect academics daily" (Exh. 1 at 1). The IEP notes that J.R. "struggles with working memory" and that he "fatigues when writing" (Exh. 1 at 1). J.R. also struggled to control his emotions around others. The IEP recounts J.R.'s trouble controlling his frustration and temper, noting that J.R. "continues to take medication daily for anger management concerns" and stating that J.R. needs to learn to "increase frustration tolerance and voice his feelings/thoughts" (Exh. 1 at 1-2). Therefore, the IEP contained goals for J.R. to "increase his social pragmatic skills," and "increase his turn taking skills during verbal interchanges within a small group setting" (Exh. 1 at 4).

Contrary to J.R.'s needs and the IEP's goals, Ms. Datre testified that in her classroom of six or seven students, three of the students had behavior problems (Tr. 41, 50). One of these students was "an ongoing problem -- he's an issue every day. He has a behavior intervention plan so he does have a behavior problem" (Tr. 50-51). Ms. Datre explained that if J.R. needed to be in an environment with few distractions he would have to be removed from her classroom: "I do have [...] behavior problems in my room, so if he needs minimal distractions, he would have to be removed to another location" (Tr. 47). Therefore, P.S. 8 could not provide an appropriate environment to J.R. given his problems with attention and in controlling his frustration. *Cf. K.R. ex rel. Matthew R. v. New York City Dept. of Educ.*, No. 13-CV-7464, 2015 WL 1808911, at *10 (S.D.N.Y. Apr. 20, 2015) (affirming an IHO's conclusion that the DOE had denied a child a

27

FAPE "based on the testimony of [the placement school's] assistant principal and the special education teacher of the proposed class, that [the placement school] would be unable to implement the requirements of the IEP, which mandated 'sensory tools and sensory breaks'").

Thus, the IHO correctly found that P.S. 8 was inappropriate for J.R. because the school's 12:1+1 classroom environment was not "quiet, calm, and focused" (FFD 7). The "size and composition" of special classes must "be based on the similarity of the individual needs of the students," including "levels of social development" and "the management needs of the students in the classroom." 8 N.Y.C.R.R. § 200.6(h)(2). "[I]t is the District's obligation to group special education students appropriately." *E.A.M. v. New York City Dep't of Educ.*, No. 11-CV-3730, 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012). In this case, the DOE failed to do so.

In short, Ms. Datre's testimony makes clear that P.S. 8 was not able to implement the IEP and provide J.R. with appropriate educational services. *M.O.*, 2015 WL 4256024, at *6-7.

### POINT III: J.R.'S PLACEMENT AT MARY MCDOWELL WAS APPROPRIATE

The SRO did not reach a determination regarding whether Mary McDowell was an appropriate placement for J.R. for the 2012-2013 school year (SRO Dec. 10). This Court therefore should accord due deference to the determination of the IHO that Mary McDowell was an appropriate placement for J.R. *M.H. v. New York City Dep't of Educ.*, 712 F.Supp.2d 125, 163 (S.D.N.Y. 2010) ("Because the SRO made no specific findings with respect to the appropriateness of the [private placement], the Court must defer to the findings and conclusions of the IHO insofar as they are well 'reasoned and supported by the record.'" (internal citations omitted) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007)), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

The IHO correctly determined that Mary McDowell was an appropriate placement for J.R. (FFD 8). Under *Burlington* Prong II, a private school is appropriate if it provides services that are "proper under the Act," *Carter*, 510 U.S. at 15; *Burlington*, 471 U.S. at 370, i.e., the services are "'likely to produce progress, not regression,'" *Gagliardo*, 489 F.3d at 112 (quoting *Walczak*, 142 F.3d at 130). Parents must show that the "placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006) (quoting *Rowley*, 458 U.S. at 188–89).

In this case, during the two school years prior to the 2012-2013 school year, J.R. was placed in classrooms with two teachers and 10 to 11 students (Tr. 77-78, 82-83, 95). In these classrooms J.R. had difficulty with expressive and receptive language as he needed language broken down into small components (Tr. 77). J.R.'s problems with working memory required that he receive more repetition than could be provided in a class with two teachers and 10 or 11 students (Tr. 77). He became easily frustrated and his self-esteem was impacted when he fell behind, which led to emotional outbursts (Tr. 77-78). J.R.'s therapist and his educators at Mary McDowell determined that he required a smaller setting and, therefore, he was placed in the Whittier Room, a classroom with seven students and two teachers (Exh. C; Tr. 57, 78, 87).

The Whittier Room proved to be an appropriate placement for J.R. Like J.R., the six other students all had language-based learning disabilities (Tr. 57, 75-76, 89). Academics were taught at a slow, consistent pace and the teachers presented material "numerous times to allow for repetition and over-learning" (Tr. 57). The instruction was multi-sensory and hands-on, and classes in the Whittier Room were interactive to allow "the children to engage with the new material in numerous ways and over numerous times" (Tr. 57). In math and reading, the class

29

was broken up into smaller groups so that the children "can have the direct instruction that they need" (Tr. 57-58). For math, J.R. was in a four-student group that met four times a week for 45-minute sessions (Tr. 63-64). J.R. was in a four-student reading group that met for one hour sessions four times a week (Tr. 63-64).

The Whittier Room provided J.R. with a calm environment as none of its students had behavior problems or were disruptive; "the class [was] a very quiet group of children who work[ed] well together" (Tr. 58). Mary McDowell provided J.R. with 90 minutes a week of speech and language therapy and 60 minutes a week of occupational therapy in sessions that he attended with one other student (Tr. 61). J.R. also met with a counselor on an as-needed basis, which amounted to about once a week (Tr. 61-62).

While "a child's progress [in a unilateral private placement] is relevant to the court's review [...] such progress does not itself demonstrate that a private placement was appropriate." *Gagliardo*, 489 F.3d at 115. Nevertheless, J.R. did make academic, social, and emotional progress during the 2012-2013 school year. His reading comprehension improved (Tr. 66). His ability to decode most consonant-vowel-consonant words and sight words increased (Tr. 66-67).[4] By the end of February 2013, J.R. was beginning to be able to decode blend words and add suffixes to the end of words, which he was unable to do at the start of the school year (Tr. 67).[5] J.R. also gained confidence in his abilities during the school year, which allowed him to begin to better moderate his frustration tolerance, which, in turn, allowed him to make greater academic

[4] The term consonant-vowel-consonant pertains "to a word or syllable composed of letters with a consonant-vowel-consonant pattern. Short words or syllables with this pattern are a common starting point for reading phonetically regular words." Judith R. Birsh, Multisensory Teaching of Basic Language Skills 564 (Paul H. Brooks Pub., 2d ed. 2005).

[5] The term "blend" refers to "two or more adjacent consonants (a consonant blend) or two or more adjacent vowels (a vowel blend) whose sounds flow smoothly together." Judith R. Birsh, Multisensory Teaching of Basic Language Skills 562 (Paul H. Brooks Pub., 2d ed. 2005). Examples of consonant blends include, *bl* and *mp* in *blimp* and *spl* and *nt* in *splint*. *Id.* at 157.

30

progress (Tr. 58, 96). He became more independent in completing his homework, and he

engaged more with other children (Tr. 96). J.R.'s speech improved dramatically, and he had

begun to overcome his phobia of heights (Tr. 96).

### POINT IV: THE EQUITIES FAVOR AN AWARD OF TUITION PAYMENT

Equitable considerations bear on the appropriate relief to be awarded under the IDEA,

*Burlington*, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state

and federal regulations pending review, the reasonableness of the parties' positions, and like

matters.'" *Wolfe v. Taconic-Hills Cent. Sch. Dist.*, 167 F.Supp.2d 530, 534 (N.D.N.Y. 2001)

(quoting *Burlington v. Dep't of Educ.*, 736 F.2d 773, 801-02 (1st Cir. 1984)).

Ms. L. participated in the May 2012 CSE meeting and informed the DOE of her concern

that J.R. needed a smaller setting than a 12:1+1 classroom could provide (Exh. 1 at 11; Exh. G;

Tr. 16, 23, 25). After receiving the notice that J.R. was to be placed at P.S. 8, Ms. L. visited the

school when it opened for the 2012-2013 school year (Exh. G; Exh. H). By letters dated August

22 and October 1, 2012 Ms. L. informed the DOE of her concerns with the IEP and J.R.'s

placement at P.S. 8, and she timely notified the DOE of her intent to enroll J.R. at Mary

McDowell (Exh. G; Exh. H). Ms. L. signed the Mary McDowell enrollment contract late in the

summer of 2012 (Exh. F). Notably, a clause in the contract released Ms. L. without any financial

penalty above a non-refundable $500 deposit if, prior to October 1, 2012, she chose to accept a

DOE placement (Exh. F ¶ 4).

The record establishes that Ms. L. cooperated with the DOE and did not impede the

DOE's ability to offer J.R. a FAPE. As such, the equities favor an award of tuition payment. *Cf.*

*N.R. v. New York City Dep't of Educ.*, No. 07-CV-9648, 2009 WL 874061, at *6 (S.D.N.Y. Mar.

31, 2009) (finding in favor of a parent on *Burlington* Prong III where record was "bereft of any

evidence that [a parent] hindered [the DOE's] efforts to provide a FAPE or otherwise frustrated the placement process"); *see also M.M. v. New York City Dep't of Educ.*, No. 11-CV-3517, 2014 WL 2757042, at *8 (S.D.N.Y. June 27, 2014) (where there was no evidence that a parent had been uncooperative in the process of developing an IEP "the DOE ha[d] not met its burden of showing that the equities do not favor reimbursement").

### POINT V: DIRECT PAYMENT OF TUITION IS APPROPRIATE

This Court should order the DOE to pay J.R.'s 2012-2013 tuition directly to Mary McDowell. *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 453-54 (2d Cir. 2014) ("the broad spectrum of equitable relief contemplated under the IDEA encompasses, in appropriate circumstances, a 'direct-payment' remedy" which "furthers the IDEA's remedial purposes by extending the unilateral withdrawal option to parents with limited financial means, who otherwise could not avail themselves of it"). The terms of the Mary McDowell's enrollment contract unambiguously create a binding obligation on the part of Ms. L. to pay J.R.'s $71,808 tuition for the 2012–2013 school year (Exh. F ¶ 1.a). Moreover, Ms. L. presented uncontroverted evidence that she lacked the financial resources to front the costs of the tuition: Ms. L. testified at the hearing that she had been laid-off shorty after Hurricane Sandy hit New York City and she was currently unemployed (Tr. 97). She had four children, including another disabled child (Tr. 99). She received food stamps, child support payments, and J.R. received SSI (Tr. 97-98; *see* Exh. I (a notice from the Social Security Administration indicating that J.R. received SSI)).[6]

---

[6] SSI is a poverty-based benefit program for the aged and disabled. *See* 42 U.S.C. § 1381a ("Every aged, blind, or disabled individual who is determined … to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this title, be paid benefits by the Commissioner of Social Security").

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court overturn the SRO's decision and issue an award in favor of Ms. L.

Dated: New York, New York
      July 31, 2015

/s/ Thomas Gray
THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 246
tgray@pfcr.org

33