1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - -X
J.L., individually and on    :  15-CV-1200-CBA
behalf of and as Parent      :
of J.R., a student with a    :
disability,                  :
          Plaintiff,         :  United States Courthouse
                             :  Brooklyn, New York
                             :
   -against-                 :
                             :
                             :  Wednesday, January 6, 2016
NEW YORK CITY DEPARTMENT      :  3:00 p.m.
OF EDUCATION,                 :
          Defendant.         :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiffs:    Partnership for Children's Rights
                           271 Madison Avenue, 17th Floor
                           New York, New York 10016
                       BY:  THOMAS GRAY, ESQ.


For the Defendant:     New York City Law Department
                       100 Church St, Room 2-306
                       New York, New York 10007
                       BY:  LESLEY BERSON MBAYE, ESQ.



Court Reporter:  Lisa Schwam, RPR, CRR, RMR
                 Official Court Reporter
                 Telephone: (718) 613-2268

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

2

1              (In open court.)

2              THE LAW CLERK:  J.L. v. New York City Department of

3      Education, 15-CV-1200, on for oral argument.

4              THE COURT:  All right.  Would the parties state

5      their appearances, please, first for plaintiff.

6              MR. GRAY:  Yes, your Honor.  Thomas Gray from

7      Partnership for Children's Rights on behalf of plaintiffs,

8      J.L.  and J.R.

9              THE COURT:  Okay.

10             MS. MBAYE:  Leslie Mbaye of the Office of the

11     Corporation Counsel on behalf of the defendant, Department

12     of Education.

13             THE COURT:  All right.  Good afternoon.

14             MS. MBAYE:  Good afternoon, your Honor.

15             THE COURT:  Mr. Gray, do you want to be heard

16     first?

17             MR. GRAY:  Yes.  That's fine.  Thank you.

18             May I approach?

19             THE COURT:  Yes, sure.

20             MR. GRAY:  Your Honor, plaintiffs' primary

21     contention in this case or primary argument is a sufficiency

22     argument.  The DOE had a burden to present evidence and the

23     DOE didn't meet that burden.

24             THE COURT:  In terms of the recommendation over

25     the placement of the classroom size.

3

1        MR. GRAY:  That's right.  The parents' primary

2  allegation at the impartial hearing is that the 12:1:1 class

3  placement --

4        THE COURT:  Was too large and not sufficient.

5        MR. GRAY:  Yes, that's right.  And that's the

6  allegation -- that's the primary allegation.  Under New York

7  state law, it's the DOE's burden, it's the school district's

8  burden, to present evidence to show that the child is being

9  provided an appropriate education.  In this case, the DOE

10  just didn't present evidence.  It's the meat of our

11  contention before your Honor.

12        THE COURT:  Didn't present evidence at which --

13        MR. GRAY:  Didn't present evidence before the IHO.

14  They presented three documents.  I'm sorry.  They didn't

15  present evidence to meet their burden, I should say.

16        THE COURT:  Okay.

17        MR. GRAY:  They presented three documents.  They

18  presented the IEP itself, the educational program itself,

19  the recommendation itself.  They presented a notice of

20  placement, basically placing the child at a particular

21  public school.  And they presented mailing notices.  They

22  didn't present any documents --

23        THE COURT:  Any testimony?

24        MR. GRAY:  They didn't present any testimony, it's

25  our position.  And I think if your Honor reviews the

4

1    transcript, the person from the DOE who was testifying at

2    the hearing, Ms. Piccola, doesn't present any testimony that

3    the 12:1:1 recommendation is actually appropriate for this

4    particular child, to meet this child's unique needs.

5            You know, the sufficiency argument was made at the

6    impartial hearing and made before the SRO.  The SRO, you

7    know, overruled or reversed the IHO's ruling.  The IHO in

8    this case found that the DOE didn't meet its burden to show

9    that it provided the child with a FAPE.  And the SRO's

10   reasoning is rather irrelevant to the primary contention of

11   the parents.

12           THE COURT:  In what way?

13           MR. GRAY:  Well, you know, if you go through the

14   reasons as I outlined in my initial brief -- our initial

15   brief -- you know, first of all, the SRO obviously doesn't

16   cite any documentary evidence or testimonial evidence that

17   directly supports the program.  You know, the SRO cites to

18   the functional levels, basically, the grade level at which

19   the child is performing math and reading.

20           Now, the level at which the child is performing

21   math or reading isn't directly relevant to whether that

22   child can actually learn and progress in a classroom with 12

23   children and one teacher.  The SRO also says, well, the DOE

24   considered placing this child in an ICT classroom, which is

25   an integrated co-teaching classroom.  And that classroom is

1    a 30-student classroom -- can be up to 30 students.

2           So, you know, the fact that the DOE considered

3    placing the child in a larger classroom isn't relevant to

4    the parents' contention at this stage that the child needed

5    a smaller classroom than a 12-student classroom.

6           THE COURT:  Where is the support or evidence for

7    the fact that this 12 -- I know what you're talking about

8    about burdens, but this 12-person classroom is too large?

9    What would have put the drafters of the IEP on notice of

10   that fact?

11          MR. GRAY:  That's right.  Well, the parent and

12   Ms. Carfagna, I believe is how you pronounce her last name,

13   who is the teacher from Mary McDowell Friends, the private

14   school in this case where the child is attending the school

15   year prior, the 2011-2012 school year, they were at the IEP

16   meeting.  Ms. Piccola's testimony, I believe it's on page 23

17   of the transcript, is that they objected to the 12:1:1

18   program as being too large for the child.

19          So the educator who is teaching the child says

20   that's too large a program for him.  The fact that the child

21   was in a classroom the prior school year with 11 students, I

22   believe, and two teachers, so basically double --

23          THE COURT:  So the prior placement was a smaller

24   placement than what was even being recommended.  My

25   understanding is that the earlier placement was 11 students

6

1  and 2 teachers?

2          MR. GRAY:  That's right.

3          THE COURT:  What was being proposed was 12

4  students, a teacher and a paraprofessional?

5          MR. GRAY:  That's right.

6          THE COURT:  And then the teacher at the meeting

7  was saying that even this 11 people with two teachers was

8  too large?

9          MR. GRAY:  Well, right.  The evidence that comes

10  out at the hearing, right, is that the child is struggling

11  in this classroom with 11 students and 2 teachers and is

12  having a lot of trouble progressing and, in fact, was going

13  to be counseled out, I assume removed, from the school.

14          But before removing the child from the school --

15          THE COURT:  What does "counseled out" mean?

16          MR. GRAY:  I'm assuming that means removed.

17  That's the term.

18          THE COURT:  Because the school can't provide that

19  level?

20          MR. GRAY:  That's right.  From Mary McDowell, Beth

21  Schneider, who I think is the president or one of the high

22  administrators at the school, it came out a little bit at

23  the hearing through the parent as well.  But instead of

24  counseling the child out or removing the child from the

25  school, they put the child in a smaller classroom called the

7

1    Whittier room.

2          THE COURT:  That's where the child spent the

3    fourth year that you're seeking reimbursement for?

4          MR. GRAY:  That's right.  The child was able to

5    make good progress in that very small environment where he

6    could get --

7          THE COURT:  The tuition was $71,000?

8          MR. GRAY:  Thereabouts, yes.

9          THE COURT:  Now, does the city pay that full

10   tuition?  Is that what they are required to do under this

11   program, they would have to pay the 71,000?  Or if the city

12   is -- if it's determined that the city is the one picking up

13   the bill, do these schools give some leeway to the city or

14   is the fee reduced?  How does that work?

15         MR. GRAY:  Generally, in cases that have reached

16   this stage for sure, generally the city pays -- if the city

17   can't prove that they have provided the child with an

18   appropriate education, they are liable for the tuition.

19         THE COURT:  No matter what the school wants to

20   charge?

21         MR. GRAY:  That's right, that's right.  That's the

22   tuition at the school.

23         THE COURT:  So there's no cap on anything that the

24   city pays?

25         MR. GRAY:  Not that I'm aware of.  I mean, you

8

1    know, not that this is directly relevant to this case, but I

2    know this is a very high tuition, but there are schools out

3    there for special needs kids that have even much higher

4    tuition than this.  My understanding is that unless the case

5    settles or there's some negotiation between the school, the

6    parent and the city, the full tuition is paid.

7          THE COURT:  Have you had any settlement

8    discussions with regard to this case?

9          MR. GRAY:  No, your Honor.  I'd be happy to engage

10   in them.

11         THE COURT:  These cases are sometimes settled.

12   And what basis are they settled on?  Because if the city

13   paid the full tuition, that's not exactly a settlement.

14         MR. GRAY:  That's right.

15         THE COURT:  Are they settled in some different

16   way?

17         MR. GRAY:  In my experience, and the agency's

18   counsel might have more experience than me in this,

19   generally they are settled prior to a hearing or prior to an

20   administrative appeal or sometimes at district court.  And

21   usually it's a rather straight forward, look, we think our

22   chances of winning are 80 percent versus 20 percent so will

23   you compromise on the tuition.

24         THE COURT:  I see.

25         MR. GRAY:  From our organization, our organization

9

 1  is a legal services organization partnership so our parents

 2  don't have money to pay the tuition so they have to rely on

 3  reimbursement or direct payment, which is what we're asking

 4  for in this case.

 5          THE COURT:  I see.  The child attended this school

 6  for the full fourth grade?

 7          MR. GRAY:  That's right.

 8          THE COURT:  The tuition has not been paid.

 9          MR. GRAY:  The tuition has not been paid, that's

10  right.  So obviously some schools are more lenient than

11  other schools.

12          THE COURT:  Again, this is just a background

13  question, it's not at all relevant to the issues in the

14  case, but are the large percentage of tuitions at schools

15  such as this paid by the city or do you know that?

16          MR. GRAY:  I wouldn't know that.  I mean, I --

17  my -- this is just from what I glean is that the school, you

18  know, Mary McDowell, certain schools have larger percentage

19  of kids who get funding from the city, and certain schools

20  have a larger percentage of kids who get funding from their

21  parents or from a relative or some private source.  My

22  understanding, which may be wrong, is that Mary McDowell

23  doesn't have too many cases such as this one.

24          THE COURT:  Now, this Mary McDowell is in Staten

25  Island?

1          MR. GRAY:  No.  It's on Bergen Street.

2          THE COURT:  No.  There's one on Sidney Place.

3          MR. GRAY:  I think it's expanded.  Maybe this is

4    the one on Sidney.

5          THE COURT:  I thought I saw something about Staten

6    Island which I didn't understand.

7          MR. GRAY:  The parent lives in Staten Island.

8          THE COURT:  Maybe it was a typo.  I wondered about

9    that because the school, as I understand it, is on Sidney

10   Place or at least one of them.

11         MR. GRAY:  I think maybe you're right.  There is a

12   branch on Sidney.  I know there's a branch on Bergen.  I

13   think there's another branch down in Red Hook.

14         THE COURT:  And the PSA that we're talking about

15   is the PSA in this neighborhood?

16         MR. GRAY:  No.  That's the PSA in Staten Island.

17   So the parent was living at the time in Staten Island.

18         THE COURT:  Oh, okay.  That's a separate PSA than

19   Staten Island?

20         MR. GRAY:  That's right.

21         THE COURT:  So your basic contention is that

22   there's just no support for this conclusion in the IEP that

23   this is an appropriate class size.

24         MR. GRAY:  That the DOE didn't present any

25   evidence to support its recommendation, and the burden is

1    clear under New York law that they have to present, you

2    know, evidence both to produce evidence and present

3    persuasive evidence to a fact-finder.  And that just did not

4    happen in this case.

5            The secondary argument is that the issue when it

6    comes to placement school, which is the PSA in Staten

7    Island, which I guess is the one that hasn't been in the

8    news recently, but the PSA in Staten Island, the school has

9    to be able to implement the IEP as written.  At the hearing,

10   the DOE -- you know, the mom visits the school and says,

11   look, the school appears to be too crowded or something to

12   that effect and would not be appropriate for my child who,

13   you know, needs a calm environment with minimal

14   distractions.

15           At that impartial hearing, the DOE teacher, the

16   teacher from PSA, testifies, yeah, we couldn't implement the

17   certain aspects of this IEP.

18           THE COURT:  The testing?

19           MR. GRAY:  The testing, that's right.  And if the

20   child had attended the school, the IEP would have had to

21   have been changed.  So that's the secondary argument.

22   Although I don't think the Court needs to reach that if the

23   Court finds in our favor on the first argument.

24           THE COURT:  Thank you.

25           MR. GRAY:  Thank you.

1          THE COURT:  All right.  Does the city want to be

2   heard?

3          MS. MBAYE:  Thank you, your Honor.  Good

4   afternoon.

5          THE COURT:  How are you?

6          MS. MBAYE:  Well, thank you.  How are you?

7          THE COURT:  Fine.

8          MS. MBAYE:  I think I'd like to start by

9   responding to counsel's responses to your questions I think

10  as a place to begin addressing the defendant's position that

11  we did, in fact, offer this student a free, appropriate

12  public education.

13         THE COURT:  It all boils down to the issue of

14  class size.  That's essentially all that we're talking about

15  here.  No one is arguing about any other statements in the

16  IEP such as the child's developmental levels or other needs.

17  We're talking about class size.

18         What information supports the class size

19  determination in the IEP?

20         MS. MBAYE:  What supports that information is the

21  information that the CSE had at the time of its meeting.

22         THE COURT:  What was that?

23         MS. MBAYE:  Statements by the student's private

24  schoolteacher that he was making slow but gradual progress

25  in an 11-student classroom at the private school.

1          THE COURT:  But there was also testimony that, as

2    I understand it, that that wasn't working, that it was

3    thought that he needed more attention.

4          MS. MBAYE:  That testimony came after the CSE

5    meeting.  As such, it's impermissible under the Second

6    Circuit's decision in *R.E.* to use that to evaluate the

7    appropriateness of an IEP that was developed months earlier,

8    months before the CSE heard that testimony or had that

9    information.

10          Simply put, what the Court --

11          THE COURT:  But I thought there was a teacher at

12   the CSE meeting who apparently has only -- her views have

13   only been recited by other people, but I thought that it was

14   that individual's view that the class size had to be

15   smaller, that he was struggling in this class size?

16          MS. MBAYE:  Your Honor, I can --

17          THE COURT:  I mean, nothing in the IEP itself

18   supports the determination.  It just says -- it notes that

19   the mother thinks that he needs a smaller class.  Then it

20   talks about all of these other horribles that nobody else

21   was even proposing, like putting the child in a 30-person

22   class.  That won't work, but this seems good, without really

23   addressing the issue of the position as I understood it by

24   both the mother and the teacher that he needs to be in an

25   even smaller class size.

1          MS. MBAYE:  Your Honor, what's reflected in the

2     IEP is they felt he needed a great deal of one-to-one

3     attention and support.  That doesn't necessarily translate

4     to a smaller classroom, per se.  The DOE classrooms that are

5     available that we offer for children with disabilities,

6     there's a 12:1:1 class size, there's an 8:1:1 class size and

7     then a smaller 6 to 1 to 1.  Under the state regulations,

8     those class sizes are envisioned for students with

9     increasingly intensive need for educational intervention as

10    the class size gets smaller.  That's how the regulatory

11    structure sets these classrooms up.  In *J.R.*, we find a

12    student who, while academically he needed a great deal of 1

13    on 1 attention for specific academic needs and where his

14    learning disabilities lay, he demonstrated really terrific

15    social skills.  He was -- his teachers noted and informed

16    the CSE team that he was well liked by his peers.  That his

17    peers sought to work with him.

18          And I think most importantly, your Honor, is that

19    he was able to advocate for himself and ask for teacher's

20    help when he needed it.  And this is something that they

21    were reporting on his ability to do within an 11-student

22    classroom.

23          THE COURT:  Didn't the teacher there talk about

24    his needing a smaller setting to thrive in and how he was

25    struggling in the 11-person class with the 2?

1          MS. MBAYE:  Your Honor, to struggle in a class

2    does not mean that a class of that same or equivalent size

3    is therefore inappropriate.  The IDEA requires the

4    Department of Education to offer an education program that

5    will enable the child to make some educational progress, to

6    make meaningful educational progress.  If that progress

7    comes at the cost of a struggle, that doesn't make it

8    inappropriate.  It doesn't make it a denial of fate.

9          What we see in *J.R.* is a student with a

10   constellation of academic needs and social skills that made

11   a 12:1:1 classroom with the intense individual related

12   services that the DOE recommended to go along with that

13   program that he could have achieved an educational benefit.

14   And the benefit of being in a larger classroom which is more

15   similar to a typical general education classroom also serves

16   a benefit to him by it's always the Department of

17   Education's goals to place students with disabilities in

18   classrooms that mirror general education -- I don't want to

19   say "mirror," but classes that are as typical an educational

20   experience as possible.  And a classroom with 12 students

21   with intense need for -- or with some need for educational

22   intervention is more typical and in more, the DOE believes,

23   beneficial than an even smaller classroom with students

24   whose needs and needs for intervention are even more

25   intense.

16

1          THE COURT:  Well, you're saying all of this.  None

2    of this is explained in the IEP.  It doesn't really come up

3    with how they get to the bottom line.

4          MS. MBAYE:  Your Honor, I don't think that the IEP

5    is required to set forth the full thought process behind the

6    recommendations that it contains.  What the IEP is required

7    to contain is an accurate description of the child's social

8    and academic needs and deficits.  There's no dispute that

9    the IEP does that.  The plaintiffs have conceded at hearing

10   and in their papers that the IEP accurately and

11   appropriately described the student's functional level.

12   That it accurately and appropriately describes his

13   management needs and specific teaching techniques that are

14   effective with him.  These issues are not disputed.

15          And similarly, the goals and the annual goals that

16   are set forth in here speak directly to the needs that

17   J.R.'s mother and J.R.'s teacher from the private school

18   informed the CSE meeting about.  There is a description in

19   the transcript at page -- I'm sorry.  Can I go back and

20   retrieve my notes on that?

21          THE COURT:  Sure, sure.

22          MS. MBAYE:  Thank you.  Yes.  So the transcript at

23   page 17, your Honor, Ms. Piccola, who was the DOE

24   representative at the CSE meeting, describes how those

25   annual goals were developed.  And they were developed with

1   the explicit intention of making sure that the parents

2   understood the goals that the CSE team was proposing, could

3   respond to those suggestions, could add to them, could say,

4   no, that's not really what he needs, something else.

5   Ms. Piccola describes how they put the present level of

6   performance on the SMART Board enlarging it so that the

7   parent could really see what they were talking about and

8   develop those goals.

9           That's exactly what the IDEA is intended to

10  foster; that type of collaborative experience between the

11  district, the Department of Education personnel and the

12  child's parents to develop a program that's appropriate and

13  individualized towards his needs.  And that's what you see

14  in the IEP.  The goals that are contained within the IEP are

15  targeted expressly towards his areas of greatest deficit

16  which are language expression, language comprehension,

17  reading comprehension, decoding words, encoding words.

18  These are all outlined with specificity.  That's what an IEP

19  is required to contain under the law.

20          THE COURT:  Yes, but it doesn't explain how all

21  those other services deal with what -- and I'm reading now

22  from the original hearing officer's opinions.  The student's

23  teacher and parents have found that the student would

24  probably be very frustrated if he were to attend a class

25  with students -- he's talking about behavioral issues.  I

18

1    guess that's talking about the PSA issue, but the teacher

2    testified that for the first two years the student attended

3    a classroom of 10 and 11 students and could not keep up with

4    the class.  His self-esteem suffered and he was unable to

5    perform.  His behavior deteriorated.  He'd be frustrated and

6    overwhelmed in a larger class because of his receptive and

7    expressive language and auditory processing deficiencies.

8    The parent testified the student attended a class of 12

9    recently and had great difficulty.  His academics and

10   behavior improved with his current class of seven.

11            I mean, the fact that you may have other services,

12   it doesn't seem to me, meets the class size issue.

13            MS. MBAYE:  Your Honor, a couple of things to

14   unpack the impartial hearing officer's decision that you

15   just read.  The findings that the impartial hearing officer

16   made about students with behavioral issues in the classroom

17   was improper because -- for two reasons.  First --

18            THE COURT:  Well, forget that.  You're talking

19   about the PSA kids who were acting up.  I agree that that's

20   probably not an issue.  Who knows what kids can be in what

21   class at any given time.  I don't give much weight to that.

22            MS. MBAYE:  As to class size, I understand that's

23   your Honor's primary concern.  The information in the

24   testimony that the mother offered about the child's success

25   in the seven-student classroom, again, came long after this

1   IEP was developed.  At the time the IEP was developed, the

2   student was in a 10- or 11-person classroom at Mary McDowell

3   and was struggling but making slow and gradual progress.

4        THE COURT:  But that was a class with two

5   teachers.  Even that was a class with 10 and two teachers,

6   not a class with 12 and a teacher and a paraprofessional,

7   right.  So even the class in the IEP doesn't even reach the

8   level of the one in which he was struggling, right?

9        MS. MBAYE:  Your Honor, we think that the

10  distinction between two teachers in a classroom and a

11  teacher and a paraprofessional is not material.  That small

12  difference doesn't make the difference between offering a

13  FAPE and not offering a FAPE.

14       When you look at the transcript on page 20, a

15  witness from the Department of Education describes what a

16  typical 12:1:1 DOE classroom looks like and how it's

17  operated.  And what she describes is a class where the

18  teacher very clearly lays out expectations for the day and

19  discusses what's going to happen next and how it will

20  happen.

21       Now, this aligns with the plaintiff's description

22  of what happened at the Mary McDowell school; that there was

23  a great deal of teacher repetition.  Similarly, that's what

24  typically goes on in a DOE 12:1:1 class.  These are good

25  principles of teaching students with disabilities.

20

1            The testimony continues where the witness,

2    Ms. Piccola, describes -- and that's P-i-c-c-o-l-a --

3    describes that a teacher would lead a reading, for example,

4    and then the class would break down into smaller groups.

5    And those groups would be based on the student's functioning

6    levels.

7            And sometimes students would be placed with

8    stronger students or weaker students to draw on that

9    student's strengths to either let them lead the way a little

10   bit or have somebody pull them up a little bit.  These are

11   techniques that could be implemented by a teacher and the

12   teacher's paraprofessional and could be implemented by two

13   teachers as well.

14           So the difference between 11 students and two

15   teachers and 12 students, a teacher and a paraprofessional

16   we submit, your Honor, that that's not the difference

17   between an appropriate education and an inappropriate one.

18   That the 12:1:1 classroom is designed for students like J.R.

19   who have these needs for repetition, for small group work.

20   His recommendation for individualized speech language

21   therapy and individualized occupational therapy and group

22   counseling to work on his frustration and behavior issues,

23   these were all intended and tailored specifically for him to

24   help him make some progress, just as he had been making

25   progress in his private school classroom.

1          And this program here, the DOE feels and the SRO

2    found and is supported by the law, that this is exactly the

3    kind of classroom that is intended for this kind of student

4    and was customized appropriately for him and his particular

5    needs and would have provided him with an opportunity for

6    meaningful educational progress.

7          THE COURT:  Part of the basis for the IEP that was

8    developed was a report from the Mary McDowell school.  Where

9    is that report?  It's not in the record.

10          MS. MBAYE:  No, it is not in the record, your

11    Honor.

12          THE COURT:  Shouldn't that be in the record?

13          MS. MBAYE:  If I had my druthers defending this

14    case, your Honor, yes, it should be in the record.  However,

15    what is in the record is the parents --

16          THE COURT:  Why isn't it in the record?

17          MS. MBAYE:  I cannot answer that question.  I did

18    not handle the impartial hearing.  I do not know why that

19    was not introduced into evidence.

20          THE COURT:  Well, whose burden is it to provide a

21    full picture to the hearing?  I mean, that document could

22    cut for or against you.  But it seems like a significant

23    piece of the record that's missing.

24          Who bears the responsibility for that?

25          MS. MBAYE:  Your Honor, all the parties at the

1   impartial hearing can introduce evidence in support of their
2   case.  Just because the document isn't in the record doesn't
3   mean that there's no evidence of it.  There's testimony
4   about what was in that report.  There's testimony that --
5           THE COURT:  And what is the testimony about what
6   was in that report?
7           MS. MBAYE:  The testimony is from -- is what's
8   recounted by -- I don't have an exact cite for you right
9   now, your Honor, but I would be happy to find that when I
10  sit down and come back to you with that.
11          THE COURT:  Okay.
12          MS. MBAYE:  The question of the appropriateness of
13  evaluative materials is often raised in these IDEA cases.
14  Here plaintiff never raised that issue until federal court
15  so as an initial matter, they have waived it.  That's the
16  case of the Second Circuit decision in *C.F.*  So to discuss
17  the appropriateness of that piece of evaluative material,
18  plaintiffs may not raise it this late in the game.
19          But in the case law when you look at where courts
20  have found evaluative material to be insufficient or
21  insufficient to support an appropriate program
22  recommendation, is when you find that the evaluative
23  materials relied on are out of date, grossly out of date,
24  three years overdue, three years old, four years old.
25          What the testimony reflects and what the IEP

1   reflects and what the parents' testimony adopting what's in

2   the IEP reflects is that those materials -- that Mary

3   McDowell school report was adequate.  It was recent.

4   There's no suggestion --

5            THE COURT:  Nobody knows what it says, right?

6            MS. MBAYE:  But what it's used for, what the

7   evaluations are used for, and the input of the mother and

8   the input of the private schoolteacher, what that is used

9   for is to develop the present levels of performance that are

10  in the IEP.  And those levels of performance and those

11  levels of -- those expressions of academic management needs

12  are in the IEP and the parents and the plaintiffs have

13  conceded that they're accurate.

14           So it's really a red herring to ask this Court now

15  to focus on whether or not the right -- a certain piece of

16  paper was put in evidence when the plaintiffs have already

17  waived the issue by never raising it before, and they have

18  conceded that whatever information was gleaned from that

19  piece of paper is accurate and is good.

20           THE COURT:  You know, I'm not sure what was

21  gleaned from the piece of paper because I don't know what

22  was in it.  I mean, it could have had testing results,

23  obviously.  I don't know whether it expressed any view about

24  class size or any of the views about struggling in class or

25  any of that.

1          MS. MBAYE:  Well, class size recommendation is a

2     recommendation; that's not an evaluative metric.

3          THE COURT:  Well, was there a recommendation from

4     the school or his teachers in the school about class size

5     before the IEP was formulated?

6          MS. MBAYE:  Your Honor, it doesn't matter because

7     just because a private school or a parent says I think this

8     certain class size is right for my child, does not mean that

9     the Department of Education is obligated to adopt that.

10          THE COURT:  Well, I know it doesn't, but if the

11     school has a view based on their history with the child, it

12     should be at least considered in the formation of the IEP

13     and there should be an explanation about why it was

14     rejected.

15          And I take it that the school did have some or

16     took some position through this person that everybody keeps

17     repeating what she said as to why -- or a recommendation

18     that wasn't consistent with what was ultimately found in the

19     IEP, correct?

20          MS. MBAYE:  I hesitate to agree completely with

21     that, your Honor, because what we know was that, and as your

22     Honor has said, what the person from the private school told

23     the CSE team -- and, again, she didn't testify at the

24     hearing so we are going --

25          THE COURT:  Someone from the school did testify at

1    the hearing.  Your position as to that testimony is because

2    they are testifying about things that happened later, that

3    the testimony can't be considered?

4              MS. MBAYE:  It's impermissible retrospective

5    testimony.

6              THE COURT:  Well, what is the impermissible

7    retrospective testimony that you're speaking to?

8              MS. MBAYE:  I'm speaking of the testimony that

9    when the student was in a seven-student class in the

10   Whittier room, as plaintiff's counsel described, that he did

11   better than he had done the year before in an 11-student

12   class.  And that's impermissible because the student wasn't

13   even enrolled in that seven-person class until months after

14   the CSE meeting.

15             What the Second Circuit says in *R.E.* and in case

16   after case, that the IEP is a snapshot in time, and you have

17   to evaluate the recommendations contained therein and the

18   soundness of those recommendations based on the information

19   that the people who developed that IEP had at the time that

20   they developed it.  And in -- I'm sorry.  I'm just going to

21   get the date here.

22             The date of this IEP was May 2013 -- May 2012.

23   The student wasn't enrolled in a seven-person class.  The

24   IEP team had no knowledge whatsoever that he would be

25   enrolled in a seven-person class, let alone how he would

26

1    fair in that classroom.

2            So it's simply unfair to evaluate the

3    recommendation based on information that they did not have.

4            THE COURT:  Well, why doesn't that information

5    just shed late or corroborate the earlier opinions that were

6    expressed to the CSE by both the school and the parent that

7    this class size is too big, that he's struggling and that

8    this bears that out, in other words, it corroborates what

9    they said?  I know that the CSE doesn't have that specific

10   information at the time, but you've got people saying that.

11           MS. MBAYE:  Your Honor, the Second Circuit has

12   very clearly forbidden courts from considering that when

13   evaluating the appropriateness of a CSE team's

14   recommendation.  The information gathered after the fact is

15   not fair game.

16           THE COURT:  Okay.  Let me just ask, Mr. Gray, do

17   you have anything -- thank you.

18           MS. MBAYE:  You're welcome.  Thank you, your

19   Honor.

20           MR. GRAY:  I have nothing further, your Honor.  If

21   you have a question --

22           THE COURT:  What about counsel's point about we

23   can't consider the testimony given at the hearing by the

24   teacher who says, listen, he's been in this class for 4th

25   grade and he's doing great, and the seven-person class is

27

1  working for him and all of that?

2          Do you agree that the Circuit says that you can't

3  consider that information?

4          MR. GRAY:  No, I don't agree.  You know, the SRO's

5  position on the specific issue actually in the decision is

6  one of the irregularities or one of the problems that I

7  point out in the brief.  Look, this testimony happened at

8  the hearing.  We don't know that the CSE knew that the child

9  was struggling in 11-student classes.

10         It's very clear from the record, obviously, the

11  mom was at the CSE meeting, the teacher from Mary McDowell

12  was at the CSE meeting, it's very clear that the CSE

13  participants knew the class size that he was in.

14         THE COURT:  All right.  So what about -- the

15  testimony at the hearing, I take it, talks about what

16  he -- testimony in part talks about what's going on now in

17  the 4th grade and we're doing great and, you know, there's

18  seven children in the class.  Can that -- what counsel is

19  saying is that information can't be considered in going back

20  in time to determine whether the IEP was properly

21  formulated.

22         Do you agree with that as a legal matter?

23         MR. GRAY:  Yeah.  I guess I would say if that was

24  the only testimony or if that was the only evidence that,

25  you know, the child needed a smaller classroom and it

28

1   occurred and the CSE did know about it and it occurred nine

2   months after the CSE meeting, that would be retrospective, I

3   would agree.  Just like the DOE can't, you know, submit

4   additional evidence rehabilitating the ineffective IEP at a

5   hearing nine months later.

6        But the fact of the matter is that in this case

7   that everybody at the CSE meeting, I think the record is

8   clear, knew that the child was struggling in a class of 11.

9        THE COURT:  But you agree that it's frozen in time

10  in terms of the point that one evaluates what the CSE knew

11  at the time that they formulated the IEP?

12       MR. GRAY:  You know, I guess that sounds a little

13  bit black letter to me, but perhaps that's correct.  You

14  know, I think that the retrospective issue is irrelevant to

15  this case.

16       THE COURT:  Let me just ask you -- obviously, I'm

17  not going to discuss this with you in any depth because I

18  have to rule on the cross-motions here, but do you think

19  that there's any benefit in this case with you all

20  discussing a settlement short of resolving the issues in

21  your summary judgment motion or not?

22       MS. MBAYE:  I'd like to have a moment to confer

23  with my client about that but, as Mr. Gray pointed out,

24  these cases have been known to settle at every stage in the

25  game.  So I would not foreclose anything.  However, I would

29

1    like to --

2          THE COURT:  Why don't you talk a moment and let's

3    just see whether -- and I was just -- is there a magistrate

4    judge on this case?

5          MS. MBAYE:  I believe Magistrate Reyes.

6          THE COURT:  If you all think it's worthwhile, I

7    would like for you to discuss that issue with him, if you

8    think it's worthwhile pursuing, before I resolve this.  If

9    you don't, then fine.  I'm not going to suggest the parties

10   have to do that.  But why don't you just find out first.

11         You want to talk to your client?

12         MS. MBAYE:  Yes, please, your Honor.

13         THE COURT:  Okay.

14         (Brief pause.)

15         MS. MBAYE:  Your Honor, given the bureaucracy

16   issues -- there are still a few other people who aren't

17   present today that we'd like to talk about it with -- could

18   we submit a letter to the Court in a few days?

19         THE COURT:  Fine.  Just indicating whether you are

20   conducive to discussing it.

21         Let me just ask a quick question on the other

22   prongs to test whether the Mary McDowell placement would be

23   appropriate.  Do you challenge that, that Mary McDowell,

24   assuming this wasn't appropriate, that Mary McDowell was

25   appropriate?  Or was this a balance of equities?  Where do

1   you stand on those two prongs?

2        MS. MBAYE:  As to prong two whether or not the

3   Mary McDowell school is appropriate, we don't think that

4   there's evidence that it is.  The fact that the child had to

5   be counseled out of their main classroom, brought into this

6   smaller classroom, that his behavioral issues are being

7   helped not by the in-school programming, but really only by

8   virtue of his outside therapist and outside medication, that

9   they haven't shown that he's making educational progress

10  there.  And so we are --

11       THE COURT:  Now, at what period of time do you

12  look at that issue?  Because there was testimony -- I mean,

13  I can consider the testimony on that prong about the

14  seven-person class and all of that, correct?

15       MS. MBAYE:  Yes, you can, your Honor.

16       THE COURT:  And doesn't that seem to have been

17  working well or he was doing much better?

18       MS. MBAYE:  We think that while doing better, and

19  this is not an argument that we addressed in our papers --

20       THE COURT:  This is not an argument you're really

21  serious about, you just have to make it, right?

22       MS. MBAYE:  We don't make the equities argument at

23  all, your Honor.  We put no eggs in that basket.

24       THE COURT:  You're only putting, like, 1 out of 12

25  eggs in the Mary McDowell's not the appropriate school.

31

1          MS. MBAYE:  Precisely.

2          THE COURT:  Okay.  I got it.  Thank you very much.

3          (Time noted:  3:55 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **CERTIFICATION**

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25