UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
J.L., Individually and on Behalf of and as
Parent of J.R., a Student with a Disability,

                Plaintiff,

       -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

            Defendant.
-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-1200 (CBA) (RER)

**AMON, United States District Judge:**

      Plaintiff J.L. brings this action individually and on behalf of her son, J.R., against defendant

New York City Department of Education ("NYC DOE" or "DOE") pursuant to the Individuals

with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A). J.L.

seeks review and reversal of a final administrative decision made by a New York State Review

Officer concerning the provision of free appropriate public education for J.R., who is a student

with a disability. The parties now cross-move for summary judgment. For the reasons stated below,

J.L.'s motion is granted and NYC DOE's motion is denied.

**BACKGROUND[1]**

**I.    The IDEA**

      Under the IDEA, qualifying disabled students are entitled, each year, to free appropriate

public education ("FAPE") that conforms to a tailored education plan designed for their particular

---

[1] These facts come from the administrative record, which includes: the SRO's decision, (D.E. # 31-1 ("SRO Decision")); the IHO's decision (D.E. # 31-2 ("IHO Decision")); the DOE Petition (D.E. # 31-3 at 1–26 ("DOE Pet.")); JL's Verified Answer and Cross-Appeal (D.E. # 31-3 at 27–47 ("J.L.'s Verified Answer and Cross-Appeal")); the IHO Hearing Transcript, (D.E. # 31-8 ("IHO Hr'g Trans.")); J.L.'s October 1, 2012 letter, (D.E. # 31-9 at 12 ("J.L. Oct. 1, 2012 Letter")); the IEP, (D.E. # 31-9 at 16–25 ("IEP")); Final Notice of Recommendation, (D.E. # 31-9 at 27 ("Final Notice of Recommendation")); J.L.'s August 22, 2012 letter, (D.E. # 31-9 at 11 ("J.L. Aug. 22, 2012 Letter")); and J.L.'s Due Process complaint, (D.E. # 31-3 at 22–24 ("Due Process Compl.")).

needs. The education plan, called an Individualized Education Program ("IEP"), must be developed annually by a Committee on Special Education ("CSE")—a committee comprising at least "the student's parent(s), a representative of the school district, a special education provider, a general education teacher if the student is being considered for a general education environment, and any other individual with special knowledge or expertise concerning the child." (D.E. # 25 ("Def. Mem.") at 14 (citing 20 U.S.C. § 1414(d)(1)(B)).) In New York, decisions made by CSEs can be appealed to an Impartial Hearing Officer ("IHO"), and decisions made by IHO's can, in turn, be appealed to a State Review Officer ("SRO"). A dissatisfied party may seek judicial review of an SRO decision.

Parents of students covered under the IDEA may unilaterally reject the placement recommended by the CSE, choosing to enroll the student(s) elsewhere while they appeal the CSE's recommendation if they find that recommendation unsuitable. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 373–74 (1985). In doing so, parents can seek DOE funding for the tuition of their preferred placement if they can demonstrate: (1) that the CSE's recommended placement does not comply with the IDEA; (2) that the placement favored by the parent is appropriate given the needs of the child; and (3) that equitable considerations favor reimbursement. E.M. v. New York City Dep't of Educ., 758 F.3d 442, 451 (2d Cir. 2014). Parents who unilaterally reject the recommended placement during the pendency of an appeal of the CSE's decision "do so at their own financial risk." Burlington, 471 U.S. at 374.

## II.   J.R.'s Educational History

J.R. was born in 2003. (D.E. # 28 "(Pl. Mem.") at 1.) When J.R. was in preschool, J.L. noticed that he was struggling more than other children to learn new material and information, so she had him evaluated for special education services. (Id.) Following that evaluation, J.R. spent kindergarten and first grade at public schools, but his challenges with learning continued. (Id. at

2.) Thereafter, a neurologist recommended to J.L. that she explore schools for J.R. specifically capable of working with students who exhibited similar learning disabilities, which include "significant working memory difficulties," "receptive language processing impairments[,] and auditory processing difficulties," as well as behavioral issues arising from his frustration when he is unable to keep up with his classmates. (Id. at 1.)

During the 2010–2011 and 2011–2012 school years, which were J.R.'s second and third grade years, J.R. attended Mary McDowell Friends School ("MMFS")—a private school for disabled students. (Id. at 2.) Although both parties say that J.R. made some progress during those years, they disagree about the extent of that progress. J.L. claims that "J.R. was able to make gradual progress . . . [but] he continued to struggle in his classes that contained two teachers and 10 to 11 students." (Id.; see also Impartial Hearing Officer's Hearing Transcripts ("IHO Hr'g Trans.") 77:6–78:1.) Defendant argues that "J.R. was attending a class at MMFS with 11 students and two teachers for the 2011–2012 school year and was making progress." (Def. Mem. at 23.)

### III.    J.R.'s 2012 IEP

On May 29, 2012, a CSE was convened to prepare an IEP for J.R.'s fourth-grade year. (Pl. Mem. at 2.) Present at the meeting were: J.L.; Shirley Piccola, a school psychologist and district representative; Ann Parise, a special education teacher; and Anh Lui, a parent. (Id. at 2–3.) One of J.R.'s MMFS teachers, Michelle Carfagna, participated by phone. (Id. at 3.) In formulating the IEP, the CSE appears to have considered a school report from MMFS and the input of the various meeting participants. (IHO Hr'g Trans. 16:5–15.)

The CSE created an IEP that noted J.R.'s current levels of ability, set goals for him to achieve over the next year, and suggested a classroom placement for J.R. and a variety of support

services.[2] (See generally IEP.) In choosing a classroom placement, the CSE considered three options: an integrated co-teaching class, a special class in a community school, and a 12:1+1 classroom.[3] (IEP at 10.) The CSE opted for a 12:1+1 classroom, rejecting an integrated co-teaching class "due to academic deficits" and a special class in a community school because of J.R.'s "need for consistent redirection/prompts/check-ins."[4] (Id.) Both Carfagna and J.L. "felt that [J.R.] needed a much smaller group [than provided for in a 12:1+1 classroom] throughout the course of the day." (IHO Hr'g Trans. 23:22–25.) According to Piccola, that objection is noted in the IEP, (id.), although, in the IEP itself, the concern about classroom size is attributed primarily to J.L., (see IEP at 1).

In August of 2012, the CSE sent a letter to J.L. briefly summarizing the IEP and noting its recommendation that J.R. be placed in a 12:1+1 classroom at P.S. 8 Shirlee Solomon ("P.S. 8") for the upcoming academic year. (See Final Notice of Recommendation.) Shortly thereafter, in a letter sent by an attorney, J.L. notified the CSE that she had been unable to visit P.S. 8 because the school was closed over the summer; that J.R. had been readmitted to MMFS for the upcoming school year; that J.L. still felt a 12:1+1 classroom was not appropriate for J.R.; that J.L. therefore intended to reenroll J.R. at MMFS; and that J.L. would visit P.S. 8 when it opened for the year with the intention of enrolling J.R. there if she found it suitable. (J.L. Aug. 22, 2012 Letter.) J.L. sent a second letter in October, again through an attorney, indicating that she had since visited P.S. 8 and remained convinced that the school would not provide J.R. "the opportunity to receive

---

[2] There appears to be no serious dispute as to the assessment of J.R.'s abilities as contained in the IEP, although there is a discrepancy with respect to J.R.'s level of mathematical proficiency, which seems to be listed both at the first-grade level, (IEP at 1), and at the third-grade level, (IEP at 9). DOE attributes the discrepancy to a typo, claiming the first assessment is correct. (Def. Mem. at 23–24.)

[3] A 12:1+1 classroom has 12 students, one teacher, and one paraprofessional. (Pl. Mem. at 3.)

[4] The following line of the IEP states that, "[a]t this time, [J.R.] continues to benefit from a special class in a community school in a 12:1:1 ratio." (Id.) Nothing further in the IEP reconciles that statement with the CSE's rejection of a special class in a community school.

meaningful educational services." (J.L. Oct. 1, 2012 Letter.) She noted her intention to seek an order from an IHO compelling DOE to cover J.R.'s expenses at MMFS for 2012–2013. (Id.)

On November 19, 2012, J.L. filed a due process complaint that, among other things, objected to the 12:1+1 placement recommended by the CSE on the grounds that it was "too large for [J.R.'s] educational needs." (Pl. Mem. at 6; see also Due Process Compl. at 2.) The IHO, Esther Mora, held hearings on the complaint between December of 2012 and February of 2013. (Pl. Mem. at 6.) By that point, J.R. had spent several months of his fourth grade year at MMFS, in a seven-student, two-teacher classroom called the "Whittier Room." (Pl. Mem. at 5.)

At the hearing, DOE solicited the testimony of two people: Shirley Piccola, the school psychologist and district representative who was part of the CSE, and Jennie Datre, the special education teacher from the P.S. 8 classroom recommended for J.R. by the CSE. (Pl. Mem. at 7.) Piccola recalled objections to a 12:1+1 placement for J.R. raised before the CSE by J.L. and by J.R.'s previous MMFS teacher. (IHO Hr'g Trans. 23:22–25.) Ms. Datre interpreted the IEP to require testing accommodations for J.R. that she was not completely certain her classroom could support, (id. at 49:19–25), and she discussed the behavioral problems of some of the students who would have been J.R.'s classmates at P.S. 8, (id. at 50:18–51:1).[5] DOE also submitted three pieces of documentary evidence: the IEP, the Final Notice of Recommendation sent to J.L. in August of 2012, and certified mail receipts pertaining to the Final Notice of Recommendation. (Pl. Mem. at 6; IHO Decision at 10.) DOE did not introduce the MMFS report relied upon by the CSE in developing J.R.'s IEP. (Pl. Mem. at 6.)

---

[5] The parties diverge in their characterization of Datre's testimony. According to J.L., Datre admitted that her classroom at P.S. 8 could not adhere to all of the IEP's recommendations for J.R.'s fourth grade education. (Pl.'s Mem. at 7.) According to DOE, Datre's concerns did not reach any accommodations for J.R. explicitly required by the IEP. (Def. Mem. at 11.)

J.L. introduced documentary evidence related to her objections to the 12:1+1 placement, as well as her preferred MMFS placement, and her income. (See IHO Decision at 10.) On behalf of J.R., the IHO heard testimony from Elizabeth Ballantyne, the Head Teacher of MMFS; Beth Schneider, the Associate Head of MMFS; and J.L. (Def. Mem. at 11.) J.R.'s witnesses addressed, among other things, his progress that year in the Whittier Room. (IHO Hr'g Trans. at 68–91.)

On March 19, 2013, the IHO issued her decision. (Def. Mem. at 9.) She found that the CSE had failed to offer J.R. a FAPE; that the MMFS placement chosen by J.L. was appropriate; and that the balance of equities favored J.L. (IHO Decision at 7–8.) Specifically, with respect to the propriety of the 12:1+1 placement, the IHO found that "[t]he record establishes that [J.R.] recently attended classes with ten and eleven students and had great difficulty." She also found that P.S. 8 would not have afforded J.R. the "quiet, calm and focused environment" that he "requires" as a result of his learning disability. (Id. at 7.) The IHO therefore ordered DOE to pay J.R.'s MMFS tuition for the 2012–2013 school year.[6] (Id. at 8.)

On April 23, 2013, DOE appealed the IHO's decision to an SRO, Carol H. Hauge. (Pl. Mem. at 9–10.) DOE argued, inter alia, that J.R. had made sufficient progress in comparable classrooms at MMFS and therefore that the 12:1+1 placement constituted a FAPE under the IDEA. (DOE Pet. ¶ 28.) On November 25, 2014, approximately 18 months later, the SRO issued a decision reversing the IHO and finding that the 12:1+1 placement at P.S. 8 did constitute a FAPE.[7] (Pl. Mem. at 10.) The SRO did not reach the question of whether MMFS was also appropriate for J.R., or where the balance of equities fell. (Id. at 11.) The SRO's decision appears to have been

---

[6] At the IHO hearings, J.L. contested the admission of some of DOE's evidence, including the IEP, by noting that the evidence had not been disclosed to her timely as required by statute. (See IHO Hr'g Trans. 9:8–12:10.) The IHO ultimate admitted the evidence, and when DOE appealed that decision to the SRO, J.L. cross-appealed the admission of the evidence by the IHO. (See J.L.'s Verified Answer and Cross-Appeal, ¶¶ 47–51.) The SRO ultimately upheld the IHO's decision to admit the evidence. (SRO Decision at 5.)

[7] Citing 34 C.F.R. § 300.515(b)(1), J.L. argues that the SRO was obligated to provide a final decision much sooner. (Pl.'s Mem. at 10.)

based exclusively on the administrative record, DOE's appeal, and J.L.'s response and cross-appeal. (Id. at 9–10.)

## DISCUSSION

### I.    Standard of Review

The motions before the Court are styled as cross-motions for summary judgment, but district courts reviewing administrative decisions under the IDEA are "not dealing with summary judgment in its traditional setting." Wall by Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996). Pursuant to the statute, the court is to "receive the records of the administrative proceedings; . . . hear additional evidence at the request of a party; and[,] basing its decision on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 205 (1982) (noting that courts reviewing administrative IDEA determinations are to make "independent decision[s] based on a preponderance of the evidence") (alteration in original) (quotation marks and citations omitted).

The independent review conducted by federal courts should give "due weight" to the administrative proceedings below, for "the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (alteration in original) (citations omitted). Therefore, the power to review administrative IDEA decisions "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. Nevertheless, "federal courts do not simply rubber stamp administrative decisions." Id.

In applying the appropriate level of scrutiny to administrative decisions, courts "must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'" Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007) (citing Walczak, 142 F.3d at 130). Courts are to use "the same objective evidence standard" when assessing the private placement selected by the student's parents. Id.

When the decisions of the IHO and the SRO conflict, the courts typically "defer to the reasoned conclusions of the SRO as the final state administrative determination." C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) (quotation marks and citations omitted). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." Walczak, 142 F.3d at 129. But the IHO receives deference "when the SRO's determinations are insufficiently reasoned to merit deference," as well as on issues that the SRO does not reach. C.F., 746 F.3d at 77.

## II.    The Burlington-Carter Test

As noted above, "parents who have unilaterally placed their child in private school will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement is appropriate to meet the child's needs, and (3) equitable considerations favor reimbursement." E.M. v. New York City Dep't of Educ., 758 F.3d 442, 451 (2d Cir. 2014). This three-part assessment is known as the "Burlington-Carter test." Id. (citing Dep't of Educ. of Mass., 471 U.S. at 369 and Florence Cty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, 15 (1993)). "[T]he broad spectrum of equitable relief contemplated under the IDEA encompasses, in appropriate circumstances, a 'direct-payment' remedy," under which DOE could pay its reimbursement directly to the school attended by the student rather than to the parent. E.M., 758 F.3d at 453.

### A. Prong One of the <u>Burlington-Carter</u> Test

The first question the Court must address is whether DOE offered J.R. a FAPE when it recommended placing him in a 12:1+1 classroom. To offer J.R. a FAPE, DOE would have to meet both a procedural and a substantive standard. <u>P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)</u>, 819 F. Supp. 2d 90, 104 (E.D.N.Y. 2011) <u>aff'd</u>, <u>appeal dismissed</u>, 526 F. App'x 135 (2d Cir. 2013) ("In addressing the first prong of the test, a court considers whether the student's IEP was developed according to the procedural and substantive requirements of the IDEA."). If the Court finds that DOE did offer J.R. a FAPE, it need not reach the other prongs of the test. <u>Id.</u>

Procedurally, DOE must comply with the statutory requirements concerning the constitution of the CSE and the process for generating an IEP. "A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed." <u>Id.</u> Under the statute, a procedural violation entails the denial of a FAPE when the violation "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Substantively, the placement "must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." <u>C.F.</u>, 746 F.3d at 72. Significantly, "[a] school district is not . . . required to furnish 'every special service necessary to maximize each handicapped child's potential.'" <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 194–95 (2d Cir. 2005) (quoting <u>Rowley</u>, 458 U.S. at 207). Instead, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords

the student with an opportunity greater than mere 'trivial advancement.'" Id. at 195 (quoting Walczak, 142 F.3d at 130). "Substantive inadequacy automatically entitles the parents to reimbursement." C.F., 746 F.3d at 79 (quoting R.E. v. New York City Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012)).

J.L. appears to argue primarily that DOE failed to meet the substantive standard rather than the procedural one.[8] (See D.E. # 29 "(Pl. Reply Mem.") at 3.) She argues that DOE failed to meet its burden to justify placing J.R. in a 12:1+1 classroom. (Id. at 15–18.) She argues further that the Court should not defer to the SRO's judgment that DOE provided J.R. with a FAPE. (Id. at 18–24.) Finally, J.L. argues that P.S. 8 was unable properly to implement J.R.'s IEP. (Id. at 24–28.) DOE argues that it met both the procedural and substantive requirements. (Def. Mem. at 14–20.)

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Cerra, 427 F.3d at 195. If the SRO's decision were "reasoned and supported by the record," it would therefore likely be entitled to deference. M.H. v. New York City Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012) (quotation marks and citation omitted). Here, however, the SRO's finding is not supported by the record. In particular, there is no analysis from the SRO or testimony or documentary evidence in the administrative record explaining why a 12:1+1 classroom would offer J.R. "an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (citing Walczak, 142 F.3d at 130).

Although the SRO ostensibly discusses the adequacy of the 12:1+1 placement in her decision, (see SRO Decision at 6–8), that discussion entirely omits an explanation for why such a placement would meet J.R.'s unique needs. The SRO begins by presuming that the IEP faithfully

---

[8] J.L. also suggests in passing that the record does not establish the CSE's compliance with the procedures required by statute. (D.E. # 29 at 4.)

documented J.R.'s level of ability at the time it was made, noting that J.L. never challenged the information relied upon by the CSE. (Id. at 6.) The SRO then largely recounts the contents of the IEP itself, (see id. at 6–7), before summarily concluding that DOE offered J.R. a FAPE, (id. at 8, finding that "a review of the May 2012 IEP shows that the [sic] given the student's needs as identified in the present levels of performance, the May 2012 CSE developed annual goals and recommended management supports, testing accommodations, and related services to address those needs, which in conjunction with a 12:1+1 special class placement, was reasonably calculated to enable the student to receive educational benefits and provide him with a FAPE"). The SRO states that the IEP is sufficient, but does not independently explain why that is the case. In light of these deficiencies, the decision does not warrant deference. See C.L. v. New York City Dep't of Educ., No. 12-CV-1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) aff'd, 552 F. App'x 81 (2d Cir. 2014), as amended (Feb. 3, 2014) (rejecting the SRO's decision because "[a]t no point does the SRO actually analyze the evidence or explain the reasons for its determination"); see also M.H., 685 F.3d at 249 ("The SRO failed to point to contrary evidence that he deemed more compelling [than the evidence relied upon by the IHO]. Had he done so, the district court might have properly deferred to the SRO's analysis of the IEP's goals and objectives. But the SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference.").

The SRO's omission might be less significant if the Court had other information supporting the recommended placement, but the record is bare in that respect. For one, as the SRO observes, "[t]he record does not contain any Mary McDowell school reports for [J.R.]." (Id. at 6.) Yet the only document relied upon by the CSE in creating the IEP was an MMFS report. As a result, "[n]one of the documents relied upon in developing the [IEP] . . . [are available] for review by the

SRO and this Court." <u>Brock ex rel S.B. v. New York City Dep't of Educ.</u>, No. 13-CV-8673 (GBD) (DF), 2015 WL 1516602, at *6 (S.D.N.Y. Mar. 31, 2015). The Court therefore has no documentary evidence evaluating J.R.—which could in theory support the substance of the IEP's conclusions—except the IEP itself. Leaving aside the fact that the IEP's recommendation is contested here, even the contents of the IEP are not helpful in explaining the suitability of the 12:1+1 placement.[9] (See generally IEP.)

Moreover, the testimony offered by DOE at the IHO hearing also failed to explain why the 12:1+1 placement was appropriate in the face of the objections raised by J.R.'s mother and MMFS teacher. (See IHO Hr'g Trans., 12:11–53:19.) In short, except for the IEP's recommendation, and the SRO's endorsement of the IEP, there is nothing in the record directly justifying a 12:1+1 placement for J.R. Further, even including the SRO's decision and the IEP, there is nothing in the record explaining how the proposal of a 12:1+1 placement was "reasonably calculated to enable the child to receive educational benefits[s]." <u>Cerra</u>, 427 F.3d at 194 (citing <u>Rowley</u>, 458 U.S. at 207) (alteration in original).

DOE emphasizes that J.R. "was able to make gradual progress during the 2010–2011 and 2011–2012 school years," (D.E. # 26 ("Def. Reply Mem.") at 6 (quoting Pl. Mem. at 2)), during which J.R. attended MMFS classes with 10 and 11 students. J.L. does indeed concede that J.R. made some progress during those two years, (see id. at 2), yet it does not follow that the progress supports a finding that a 12:1+1 classroom would have been appropriate for J.R.'s fourth-grade year. For example, there are many issues left unaddressed by the SRO's opinion, including: whether J.R.'s progress in the previous two years met the standard required by the IDEA; whether

---

[9] The IEP notes on one hand that J.L. pressed for a smaller classroom than a 12:1+1, and notes on the other that "[J.R.] has made slow, but gradual progress in school thus far." (IEP at 1.) The IEP does not explicitly address how a 12:1+1 classroom (as compared to the smaller room called for by his mother and teacher) would help J.R. achieve the annual goals that the CSE laid out for him.

J.R.'s needs for fourth grade (as identified in the IEP or otherwise) remained sufficiently similar to his needs from those two previous years for his earlier progress to be instructive; or whether a 12:1+1 classroom—which, if full, would be at least slightly larger than J.R.'s previous classrooms—is pedagogically equivalent to J.R.'s second- and third-grade rooms.[10]

In fact, most of the evidence specifically addressing the 12:1+1 placement instead supports the conclusion that J.R. would have been likely to struggle. First, as noted above, both J.L. and one of J.R.'s MMFS teachers, Michelle Carfagna, insisted, as the IFO found, at the CSE meeting that J.R. needed a class smaller than a 12:1+1. (IHO Hr'g Trans. 23:22–25.) J.L. maintained that objection, in one form or another, in the months after the CSE meeting. (See J.L. Aug. 22, 2012 Letter; J.L. Oct. 1, 2012 Letter.) Further, at the hearings held by the IHO, the Associate Head of MMFS, Beth Schneider, testified that she also believed J.R. would have had difficulty in a 12:1+1 classroom.[11] (IHO Hr'g Trans. 88:9–23.) Finally, after holding hearings, the IHO found that the 12:1+1 placement was inadequate under the IDEA and did not amount to a FAPE. (IHO Decision at 7–8.) She concluded, inter alia, that "the record establishes that the student recently attended classes with ten and eleven students and had great difficulty."[12] (Id. at 7.)

This Court may not "substitute [its] own notions of sound educational policy for those of the school authorities." Rowley, 458 U.S. at 206. It has therefore cabined its analysis to the balance of objective evidence in the record on the challenged portion of the IEP: the recommendation that

---

[10] According to testimony heard by the IHO, there was at some point a question as to whether J.R. would be able to remain at MMFS for fourth grade because of behavioral issues he exhibited at the school in his earlier years there, (IHO Hr'g Trans. 87:14–16), which makes the inference urged by DOE even less straightforward.

[11] Indeed, according to Schneider, it was partly as a result of J.R.'s work with outside therapists and the school's recognition of "the level of [J.R.'s] expressive and receptive language and working memory struggles" that MMFS ultimately placed J.R. in its seven-student Whittier Room for his fourth-grade year. (Id. at 87:8–88:1.)

[12] The SRO appears to attribute that conclusion by the IHO to the testimony of Beth Schneider, and further appears to have disregarded that testimony, noting that Schneider was not present at the CSE meeting. (See SRO Decision at 7 n.2). The IHO does not specify which part of the record she relied on in concluding that J.R. struggled in classes of 10 and 11 students. (See IHO Decision at 7–8.) In any event, Schneider's testimony now constitutes part of the record before the Court.

J.R. spend his 2012–2013 school year in a 12:1+1 classroom. See Gagliardo, 489 F.3d at 113. The preponderance of the objective evidence available to the Court suggests that J.R. would have struggled to learn in a 12:1+1 classroom, and would not have been "likely to make progress . . . under the proposed plan" offered in the IEP. Cerra, 427 F.3d at 195. The Court finds, therefore, that DOE did not offer J.R. a FAPE when it recommended placing him in a 12:1+1 classroom.[13]

## B. Prongs Two and Three of the Burlington-Carter Test

Although the substantive inadequacy of DOE's proposed placement "automatically entitles the parents to reimbursement," C.F., 746 F.3d at 79 (quoting R.E., 694 F.3d at 190), the second and third prongs of the Burlington-Carter Test are also satisfied here. The second prong calls for an assessment of the private placement favored by the parent(s) of the disabled student. E.M., 758 F.3d at 451. The SRO did not reach this question, finding that J.R. had lost on the first prong and therefore that there was no need to contemplate the second and third. (See SRO Decision at 10.) The IHO found that J.L.'s unilateral fourth-grade placement for J.R. at MMFS was appropriate. (See IHO Decision at 8 (concluding that, "[a]s to prong two, the record supports the parent's position that the student requires a smaller class and that Mary McDowell is providing appropriate services").) As noted above, the IHO typically receives deference on matters left unresolved by the SRO. See Walczak, 142 F.3d at 129.

"A unilateral private placement is only appropriate if it provides 'education instruction specifically designed to meet the unique needs of a handicapped child.'" Gagliardo, 489 F.3d at 115 (quoting Frank G. v. Bd. of Educ. Of Hyde Park, 459 F.3d 356, 364–65 (2d Cir. 2006)) (emphasis in original). It is not sufficient that "the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of

---

[13] Having already decided that DOE failed to offer J.R. a FAPE, the Court does not reach the question of whether P.S. 8 could have implemented the IEP.

any child, disabled or not." Id. Here, J.L. declined a 12:1+1 classroom at P.S. 8 in favor of the seven-student Whittier Room at MMFS that, according to testimony heard by the IHO, was chosen because it could provide a "more intimate environment" that would allow him to "function more effectively" than he had in his larger, earlier classrooms at MMFS. (IHO Hr'g Trans. 77:6–78:7). When it appealed the IHO's decision, DOE argued that the Whittier Room is not an appropriate placement for J.R. (See DOE Verified Petition ¶¶ 39–45.)

The IHO summarized the level of support offered by the Whittier Room, (see IHO Decision at 3), and the record contains both documentary and testimonial evidence about the Whittier Room, including testimony from J.R.'s Whittier Room teacher. (See J.L.'s IHO Hr'g Exhibits at 1–6; IHO Hr'g Trans. 55:11– 68:6.) The testimony heard by the IHO included reports of J.R.'s progress in the Whittier Room. (See IHO Hr'g Trans. 58:9–15, 96:4–25). Further, according to Associate Head of MMFS Beth Schneider, the Whittier Room program "was designed for students with expressive and receptive language based learning disabilities who were not successful in classrooms of up to 12 students." (Id. 75:21–24.) Schneider articulated why such a program was suitable for J.R.'s needs, (see id. 77:6–78:7), and explicitly stated that she thought the placement was appropriate for J.R, (id. at 78:17). The record adequately supports the IHO's conclusion that the Whittier Room is appropriate for J.R., and that conclusion is therefore entitled to deference.

The third prong of the Burlington-Carter Test requires a balancing of equitable considerations. E.M., 758 F.3d at 451. The IHO found that the equitable considerations favor J.L, (IHO Decision at 8), and the SRO did not reach the question, (see SRO Decision at 10). Equitable considerations "include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters." Wolfe v. Taconic-Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 534 (N.D.N.Y. 2001).

In its appeal to the SRO, DOE argued that equitable considerations favor DOE rather than J.L. (See DOE Verified Petition ¶¶ 46–49.) Specifically, DOE argued that J.L. had "little intention of enrolling J.R. in the recommended public placement," (id. ¶ 47), and that J.L. failed to show "a lack of financial resources to 'front' the cost of tuition" at MMFS, (id. ¶ 48 (citation omitted)). DOE's arguments are unpersuasive.

The record does not suggest that J.L. resisted DOE's recommended placement in bad faith; her documented reluctance to accept the IEP's recommended placement is suggestive, if anything, of her consistently-expressed concerns about placing J.R. in a 12:1+1 classroom. Notably, even while reiterating those concerns in response to the Final Notice of Recommendation, J.L. indicated an intention to visit P.S. 8 and enroll J.R. there if she found it suitable. (See J.L. Aug. 22, 2012 Letter.) She contacted the CSE after her visit to P.S. 8, only then definitively indicating that she would keep J.R. at MMFS and seek an IHO decision compelling DOE to pay for J.R.'s tuition. (See J.L. Oct. 1, 2012 Letter.) In the meantime, J.L. had made an arrangement with MMFS that would have allowed her to withdraw J.R. from MMFS by October 1, 2012, paying only $500. (See J.L.'s IHO Hr'g Exhibits 9.) Moreover, the IHO received evidence of J.L.'s financial situation, including testimony indicating that J.L. was unemployed at the time of the hearings, which would make it difficult for her to pay the tuition at MMFS. (See J.L.'s IHO Hr'g Exhibits at 8, 13–14; IHO Hr'g Trans. 97:1–98:23.)

The IHO concluded that J.L. "cooperated with the school district," and that equitable considerations tilted in her favor. (IHO Decision at 8.) The Court finds that the record adequately supports the IHO's determination and therefore that her decision on the balance of equities is entitled to deference. J.L. has therefore satisfied all three prongs of the Burlington-Carter Test.

16

## CONCLUSION

For the foregoing reasons, J.L.'s motion for summary judgment is granted, and NYC DOE's motion for summary judgment is denied. DOE is hereby directed to reimburse J.L. for J.R.'s tuition expenses at MMFS during the 2012–2013 school year. That reimbursement should be supplied directly to MMFS. See E.M., 758 F.3d at 453. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: November *12*, 2016
        Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge